245 N.J. Super. 504 (1991)
586 A.2d 290
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
R.M., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 26, 1990.
Decided January 23, 1991.
*505 Before Judges DREIER, ASHBEY and LANDAU.
John Kaye, Monmouth County Prosecutor, attorney for appellant (John P. Johnson, Assistant Prosecutor, of counsel and on the letter brief).
Wilfredo Caraballo, Public Defender, attorney for respondent (Helen E. Szabo, Designated Counsel, of counsel and on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
Following a report to the Division of Youth and Family Services concerning possible sexual abuse on N.W., then three years old, and a medical examination which revealed no evidence of penetration, defendant Robert M.[1] was indicted for three counts of aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(1), sexual assault, contrary to N.J.S.A. 2C:14-2b, and endangering the welfare of a child in violation of N.J.S.A. 2C:24-4a. In the course of other pre-trial procedure, the State had advised the court that the child would not testify because she could not remember.[2] The State sought to have admitted in evidence statements which the child had made to DYFS workers. On leave granted, the State appeals from the pre-trial order of the trial court which denied the State that opportunity.
Evid.R. 63(33) provides,
A statement by a child under the age of 12 relating to a sexual offense under the Code of Criminal Justice committed on, with, or against that child is admissible in a criminal proceeding brought against a defendant for the commission of such offense if (a) the proponent of the statement makes known *506 to the adverse party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 8(1), that on the basis of the time, content, and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testified at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse, provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of paragraph (b) of Rule 17. [Emphasis added.]
Applying that Rule, the trial court excluded the DYFS worker's testimony as untrustworthy.
According to the February 24, 1988 report which was admitted in evidence at the Evid.R. 8 hearing, the police had an anonymous report that N.W. was sleeping and bathing with a man she lived with. She had head lice and body sores and a neighbor saw her "lick the man she lives with pants leg [sic]." Testimony revealed that the child had been the subject of prior Division of Youth and Family Services (DYFS) investigations.
At some unspecified prior time a file had been opened, and the Division had investigated defendant's home, based on an allegation, apparently made by an older woman also living there, that the house in which she was living smelled of urine. The worker was told that the child had been left with defendant because her mother had deserted her.[3] At this hearing the worker noted that, following the investigation, defendant had improved the conditions in the house, and another worker had maintained supervision. Somewhere between the time of this earlier investigation and the current sexual assault charges, it appeared that the child had been cared for during the day by another family. Much of the cross-examination of the DYFS worker who testified was based upon the fact that the circumstances of this household were unknown to her at the time she interviewed the child and obtained the statements at issue. Apparently this household contained one adult by the name of *507 Robert and at least one older child also known by that name. In fact the adult named Robert appeared to have been charged with sexual misconduct against the child named Robert. While the worker indicated no such abuse was substantiated, a third child had been removed from the house because of sexual misconduct. These facts were relevant in the light of the child's reference to "Bobby", and concerning whether the potential for confusion made her identification untrustworthy.
At the Evid.R. 8 pre-trial hearing the State's only witness was Barbara Fraley, a DYFS worker of 15 years. She testified that on February 26, 1988, she and Kathy Schaefer Millsap,[4] social workers for DYFS, met with defendant and N.W. at the agency's office. Defendant was interviewed by an agency supervisor, while N.W. was taken into the office playroom by Millsap, assisted by Fraley. Once in the playroom, N.W. began to play with various toys while the two workers sat down, watched her and began talking with her. They asked N.W. what games she played. N.W. told them that she played "the sweetheart game" and "the foster child game" with "daddy." Fraley testified that N.W. did not describe these games. When asked who "daddy" was, N.W. responded by stating, "daddy Bobby," "daddy Bobby." The child also spoke independently of "Bobby," but Fraley said that to her they were the same person. The workers asked N.W. where she slept. N.W. replied that she slept with daddy, in his bed. The workers asked what daddy slept in, and N.W. indicated that he slept with no clothes on, while she slept in a nightgown and underpants. Fraley said that N.W. said that she could see daddy's "penie". Asked what the penie was, N.W. responded by pulling down the pants of the male doll, touched the penis and said, "this is daddy's penie." Asked if she ever touched daddy's penie, N.W. said yes and put the face of the little girl doll on *508 the penis of the male doll. She also stated that, "sometimes it broken." Fraley testified she asked if N.W.'s mouth was placed on daddy's penie. N.W. responded by saying yes, and that it tasted funny, that it tasted like "pooh-pooh". Fraley said the child said that she put medicine on daddy's penie and daddy put medicine in her "hiney", by which she pointed out the rectal area of the little girl doll. When asked where her penie was, she indicated the vaginal or rectal area of the female doll and said that it hurt. When asked if she did anything like this with anyone other than daddy, she said no.
On cross-examination Fraley could not recall if N.W. had been asked about her ability to tell truth from a lie, or when any of the incidents took place. She had not contacted the older woman who lived in the same household with defendant about the allegations, although the "worker in charge," Millsap, might have done so. Fraley had also not contacted a housekeeper who came in on a daily basis. Fraley was unsure whether the "sweetheart" game was a game that the child played at the baby-sitter's house. The child had not demonstrated how she and Daddy had slept together. Fraley said that she had special training "on [using] the dolls many years ago." She did not recall how the dolls were set up in the room. There were four sets of dolls which were homemade. Fraley said that the questions were not repeated because the child was very verbal. Fraley indicated that the day before the interview the child had been asked questions about the allegation that "she had been seen "burying her face in the pants of [defendant]", that she "put her face in [defendant's] lap and lick[ed] his pants[.]" The worker confirmed that the preferred method of questioning children was to have the child circle pictures to show where they were touched in an assault, but gave the opinion that the choice to use pictures or dolls would depend on how the worker felt in this interview. No tapes had been made of this interview.
At summation defense counsel argued that the only source for a time-frame concerning defendant's acts came from defendant's *509 own statement, and that during the prior Miranda hearing there had been testimony that the purported sexual assaults had occurred in a shower, not in defendant's bed. He also said that experts had earlier demonstrated the inability of a child to remember over time. Defendant challenged the trustworthiness of the child's statements on the ground that DYFS acceptance of them was uncritical and against available evidence. Defendant also urged that the child's lack of interest in continuing the discussion indicated an emotional distance characteristic of play rather than reality. Because Fraley had never had formal courses in the use of the dolls, defense counsel characterized her as lacking in expertise, despite her 15 years as a DYFS worker. Defense counsel also urged that the prior questioning concerning the incident in which the child was seen with her face down in defendant's lap had educated her to give certain answers to similar questions. Defendant contended there had been several DYFS interviews.[5] He urged that the worker had insufficient recollection, and that if the statements were true, they would naturally have been the subject of fresh complaint to the elderly woman who lived in the house, or to the housekeeper.
The judge examined dolls which Fraley described as similar to those used. At the end of the hearing he viewed as significant the following factors: (1) the child gave no response concerning whether she was telling the truth; (2) the child never explained the "foster child" and "sweetheart" games which were clearly a possible source of confusion; (3) the only relationship between "Daddy" and "Bobby" was elicited by leading questions; (4) the child exhibited no stress and no tears; (5) Fraley had no formal training and had not used the dolls for a long time during which pictures had become preferred as an *510 investigative tool; (6) Fraley's recollection was inadequate and she had to rely on her report.
The Prosecutor then asked to be permitted to bring in the DYFS worker from Virginia, on the grounds that this worker had examined the child concerning her ability to distinguish truth; that this worker might explain the confusion in the sweetheart and foster child games; whether there were leading questions or more than one interview; and, finally, that the missing worker might have had the training and experience which the court considered essential. The Prosecutor represented that he had intended to bring former DYFS worker Millsap to New Jersey for the trial, but had not considered her necessary for the Evid.R. 8 hearing. The judge denied his request, saying, "Again we scheduled a hearing. As far as I'm concerned, the hearing was conducted and its [sic] been concluded. You had the opportunity to bring in whatever witnesses you wanted."
The passage of Evid.R. 63(33) followed the publication of State v. D.R. There the Supreme Court wrote that a rule modification concerning statements by child victims
will enable the judicial system to deal more sensibly and effectively with the difficult problems of proof inherent in child sex abuse prosecutions. However, any such modification of the hearsay rule must adequately recognize and protect the substantial constitutional interests of defendants in such proceedings.... There is general agreement that a prerequisite to the admissibility of a child's out-of-court statement concerning sexual abuse is that it possess sufficient indicia of reliability.
State v. D.R., 109 N.J. at 363, 537 A.2d 667. In D.R. a defendant was convicted for sexually abusive conduct on his two-and-one-half year old granddaughter. At issue was the admissability of the testimony of a psychologist who "recounted the child's graphically descriptive explanation of the sexual contact." Id. at 351, 537 A.2d 667. The only other evidence was defendant's confession, which he repudiated at trial. The child had exhibited behavioral changes and vaginal soreness, not identified by her pediatrician as evidence of sexual assault, but impelling him to suggest that the child's mother contact *511 DYFS. Id. at 352, 537 A.2d 667. Some eight months after the sexual contact (as acknowledged by defendant), a psychologist had given the child anatomically correct dolls. He was allowed to testify that through them she was able to act out and demonstrate "a sexual assault, specifically talked about the penis being placed in the mouth of the young female," and that "she named the male doll Grandpa [R.] doll and the female doll baby [N]." Id. at 356, 537 A.2d 667. As an expert he was also permitted to testify that the child was suffering from post-traumatic stress caused by sexual assault. Id. at 355, 537 A.2d 667.
In affirming the admission of that testimony, the Appellate Division had created a new common-law hearsay rule, a procedure which the Supreme Court rejected, although saying that the "child victim's spontaneous out-of-court account of an act of sexual abuse may be highly credible because of its content and the surrounding circumstances." Id. at 359, 537 A.2d 667. The Court urged that there be a relaxation of the competency requirements for testimony by child sex-abuse victims. Id. at 369, 537 A.2d 667. The Court concluded that if out-of-court statements were to be admissible, the child should testify at trial. It reversed the conviction, leaving to the joint judicial-legislative process a redraft of the evidence rules. Id. at 376, 537 A.2d 667.
The judge in this case distinguished D.R., saying,
I just want to point out something that I think is significant; that is, the case that brought us this particular new statute is State versus D.R., and the case that D.R.  in that case the facts are almost very similar to this case, almost exactly the same, dealing with a three and a half year old child and alleged similar sexual acts were conducted but there was an interview and an investigation made by the police, made by DYFS workers, interviewed the child. All of that was done and then DYFS referred the child to a psychiatrist. The psychiatrist was the one who testified in D.R., a man who was trained and experienced and knew how to conduct this type of interview, how to handle the dolls in that case.
In State v. Bethune, 121 N.J. 137, 578 A.2d 364 (1990), decided after the hearing in this case, the Supreme Court recently examined the "fresh complaint" of sexual assault by an infant. A five-year old denied being assaulted but responded *512 "atypically to the gynecological exam." Id. at 140, 578 A.2d 364. A social worker observed the child using anatomically correct dolls and obtained a description of sexual assault, in which the child described that "Joey [defendant] had put his dicky in her privates many times." Ibid. The social worker's testimony was admitted as "fresh complaint." Id. at 141, 578 A.2d 364. The Court spoke of the "deference to children's special vulnerability to being cajoled and coerced into remaining silent by their abusers," which had impelled courts to "allow children additional time to make a fresh complaint," Id. at 143, 578 A.2d 364 and, "[q]uestioning of young children may be a necessary component of unearthing sexual abuse." Id. at 149, 578 A.2d 364. Significantly, the Court affirmed the conviction, noting that the testimony connected with the dolls would probably have been admissible under Evid.R. 63(33). Ibid. The Court identified "coerciveness" as a primary characteristic of untrustworthy circumstances surrounding the taking of infant statements. Id. at 145, 578 A.2d 364.
In the recent United States Supreme Court decision, Idaho v. Wright, 497 U.S. ___, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the United States Supreme Court rejected "a fixed set of procedural prerequisites" as a standard for the admission of out-of-court statements by child abuse victims. 497 U.S. at ___, 110 S.Ct. at 3148, 111 L.Ed.2d at 654. There were two children, aged five-and-one-half and two-and-one-half. The five-and-one-half year old told her divorced father that her mother held her while the mother's companion had sexual intercourse with her. The older child also said that she had seen the same thing done to the younger child. 497 U.S. at ___, 110 S.Ct. at 3143, 111 L.Ed.2d at 648. As part of the ensuing medical examination, a pediatrician had a conversation with the younger daughter who was later found not capable of communicating to the jury. When both the mother and her companion were charged with sexual assault on both children, the trial court permitted the pediatrician to testify that the younger child did "admit to that", in response to the question, "Does daddy touch *513 you with his pee-pee?" 497 U.S. at ___, 110 S.Ct. at 3144, 111 L.Ed.2d at 649. The pediatrician further testified that she did not elucidate and "clammed-up" before saying, "but he does it a lot more with my sister than with me." The pediatrician characterized this last statement as "volunteered." The doctor acknowledged that a picture that he drew during the questioning had been discarded, that his notes were not detailed and did not record any changes in the child's attitude. Ibid.
At trial the statements were admitted under an exception to the state evidence rules which allowed non-traditional hearsay, given "circumstantial guarantees of trustworthiness." 497 U.S. at ___, 110 S.Ct. at 3145, 111 L.Ed.2d at 650. On appeal from the conviction concerning assault on the younger daughter, the Idaho Supreme Court affirmed the conviction and admission of evidence as to the companion, and reversed the conviction of the mother, finding it based upon the admission of evidence in violation of the Confrontation Clause. Only the conviction of the mother was considered by the Supreme Court which affirmed the Idaho Supreme Court. 497 U.S. at ___-___, 110 S.Ct. at 3144-3145, 111 L.Ed.2d at 650-651.
In Idaho the United States Supreme Court identified a "number of factors" properly relating to whether hearsay statements made by a child witness in child sexual abuse cases are reliable, "spontaneity and consistent repetition ... mental state of the declarant ... use of terminology unexpected of a child of similar age ... [and] lack of motive to fabricate." 497 U.S. at ___, 110 S.Ct. at 3150, 111 L.Ed.2d at 656 (citations omitted). The Court rejected any procedural requirement, such as that the interview be taped, or that the statement be the product of nonleading questions, substituting a "totality of the circumstances test." The Court specifically excluded from consideration on the question of trustworthiness any extrinsic evidence tending to prove or disprove that sexual assault had taken place. 497 U.S. at ___-___, 110 S.Ct. at 3149-3150, 111 L.Ed.2d at 656-657.
*514 Concerning the case before it, the Court noted that the trial court had been influenced by extrinsic evidence, whereas the Idaho Supreme Court had properly focused on "the presumptive unreliability of the out-of-court statements and on the suggestive manner in which [the pediatrician]" had asked leading questions about what had happened to the declarant.[6] The Court characterized the "volunteered" statement by the declarant about what she had seen done to her sister, as a "closer question," but affirmed the Idaho Supreme Court's rejection of the evidence. 497 U.S. at ___, 110 S.Ct. at 3152, 111 L.Ed.2d at 659. Finally, the Court concluded with a quote from an Arizona case, "`[i]f there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness.'" 497 U.S. at ___-___, 110 S.Ct. at 3152-3153, 111 L.Ed.2d at 659-660 (citation omitted).
The trial judge in this case referred to another trial court opinion, State v. M.Z., 241 N.J. Super. 444, 575 A.2d 82 (Law Div. 1990), where the court rejected certain out-of-court statements by a three-year-old child as untrustworthy, but accepted others. 241 N.J. Super. at 450, 575 A.2d 82. In M.Z. the child's mother testified that on November 5, 1987, she found her child outside, fully dressed, very upset and shouting about, "the man, the man." Id. at 447, 575 A.2d 82. Efforts to console the child failed and there followed nightmares and bedwetting. The mother discovered a scratch on the child's stomach which the child identified as coming from "the man." From a catalogue the child identified clothing worn by "the man." Deepening concern impelled the mother to seek a counselor, who urged that the child not be questioned. After some time, the child said that "the man" had worn a clown mask and had *515 asked her to accompany him to a local ice cream parlor to meet her father and that when she refused, he threatened her with a knife. Around Christmas the child identified "the man" as someone to whom the family had given their dog. That person was defendant. Id. at 448-449, 575 A.2d 82.
The State proffered the testimony of an investigator of the prosecutor's office that she had interviewed the child some four days after the incident without result, but that on January 5, 1988, the child told the investigator that "the man" was "Mark" who has "Reilly" (the dog). The investigator testified that when she gave the child anatomically correct dolls, she demonstrated an act of sexual intercourse. That testimony was repeated before the Grand Jury. Id. at 449, 575 A.2d 82.
Reviewing the circumstances, and relying on the holding in D.R., the judge found the statements to the mother trustworthy, but not the statements to the investigator. The judge was particularly influenced by the fact that the investigator admitted that she could not separate out the child's recollection from suggestions which might have been made. The judge found that the "clinical controls" present and recommended in D.R. had been missing in this case, although the judge rejected the State's assertion that a requirement of expertise was being placed upon its witness. Id. at 550-551, 575 A.2d 82.
The trial court in this case also appeared to rely on the examiner's lack of expertise and lack of clinical setting as failing to conform to the requirements set down in D.R. We find nothing in D.R. or subsequent cases which warrants that distinction. In D.R. the interviewer was a psychologist, whereas the interviewer in M.Z. was an investigator for the prosecutor, and in Idaho the questioner was a pediatrician. In this case Fraley was a trained worker for DYFS with years of experience, a circumstance almost identical to that in Bethune, in which the Court observed that the challenged testimony most likely would have been admissible under the new evidence rule. Neither expertise nor clinical setting appears to us to be a *516 determinative factor concerning the "trustworthiness" factors selected by our Supreme Court or the United States Supreme Court. We recognize that a court may be convinced from the evidence that the partisanship of the questioner created a coercive environment. If so, such a circumstance is relevant and should be articulated. There was no such indication in this case.
We also cannot find any support for the trial court's rejection of Fraley's testimony based on the fact that N.W. was never tearful or emotionally upset during the course of the interview. See State v. D.R., 109 N.J. at 359, 537 A.2d 667.
We recognize that the court also questioned the decision of the social workers not to press N.W. for specific information on the "foster child game" and "sweetheart game" which it found lessened the credibility of N.W.'s statements. While the court was within its discretion in considering that
[t]here was no indication as [whom N.W.] played with in connection with the sweetheart game and foster game, or ... any discussion about what it constituted.... [and] the word foster child game has sort of a specific reference and the reference could be and may relate to the [foster] family[,]
nothing indicated that such a confusion impacted adversely on all of N.W.'s statements. Certain statements found to be untrustworthy could have been excised, since each statement required examination for trustworthiness.
Evid.R. 63(33) requires a two-step procedure where the declarant will not be a witness. Establishing the trustworthiness of the statement is the first step. Both under the Rule and under Idaho v. Wright, 497 U.S. at ___, 110 S.Ct. at 3152, 111 L.Ed.2d at 659, corroborating evidence of the assault may not supply the trustworthiness necessary to meet the requirements of the Confrontation Clause.[7] Of the factors mentioned by the judge, the following do not appear to be dispositive of a trustworthiness determination respecting the statements of an *517 unavailable child witness under our Supreme Court and the Confrontation Clause: (1) expertise of the interviewer; (2) lack of evidence of stress; (3) the child did not understand what it was to lie and was clearly confused concerning the persons she identified. (We also question whether such confusion was demonstrated). See State v. D.R., 109 N.J. at 369, 537 A.2d 667.[8]
The judge also observed, however, that the social worker could not adequately remember the events without continual reference to her notes. We agree with the trial judge that the witness's inability to recall, or failure to have observed, impacted on the "content ... and circumstances of the statement" and its trustworthiness. Evid.R. 63(33). We do not find error in the judge's rejection of the testimony for that reason. There was also an issue concerning whether the child's spontaneity had been adversely affected by prior questioning, clearly a relevant consideration in all of the cases and one which was inadequately explored.
The judge's well-reasoned exclusion does not dispose of the case, however, because the State proffered another witness who was also present and who had participated in the interview with the child. The child's "special vulnerability" requires that a full exploration of her complaint be made. See State v. Bethune, 121 N.J. at 143, 578 A.2d 364. The child's characterization of "daddy's penie" being broken sometimes and excreting a substance which tasted like "pooh pooh" was "graphically descriptive," State v. D.R., 109 N.J. at 351, 537 A.2d 667. It represented a "use of terminology unexpected in a child of similar age," Idaho v. Wright, 497 U.S. at ___, 110 S.Ct. at 3150, 111 L.Ed.2d at 656; it was not a statement "of the type `that one would expect a child to fabricate.'" 497 U.S. at ___, *518 110 S.Ct. at 3152, 111 L.Ed.2d at 659. Those words, if truly spoken and not suggested by others, indicated a reliability based on content and circumstance. Evid.R. 63(33). In light of the importance of the evidence, it was error for the judge to have denied the State the opportunity to augment the pre-trial hearing in order to produce the other witness who might remedy the deficiencies the judge properly noted.
The matter is therefore remanded for a new hearing.
NOTES
[1] We have given defendant's first name due to its significance at the hearing.
[2] As we will further detail, missing from this record is the record of prior pre-trial hearings. There was a Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), hearing which resulted in a ruling that defendant's statement would be admissible. There may have been a ruling that the child was unavailable as a witness. But see State v. D.R., 109 N.J. 348, 367, 537 A.2d 667 (1988). The State asserts that a polygraph examination confirmed that defendant was not answering truthfully on the issue of sexual abuse.
[3] According to defendant's brief, defendant had custody since the child was nine months old.
[4] At the time of the hearing Millsap had relocated to Virginia. She did not testify. Following the court's adverse ruling, the State unsuccessfully sought a new hearing at which Millsap would testify.
[5] Although the State disagreed, the number of interviews in which the child had been asked the same or similar questions was never determined. The State was unable to make any representation.
[6] Respecting "presumptive unreliability," contrast our Supreme Court's reference to modern thought on infant reports of sexual abuse. State v. D.R., supra, 109 N.J. at 360-363, 537 A.2d 667. See also State v. R.W., 104 N.J. 14, 23, 514 A.2d 1287 (1986).
[7] The Rule, however, provides that such evidence is an additional requirement.
[8] Although beyond the scope of this appeal, we consider the reasons given for why the child was not going to testify inadequate. See State v. D.R., supra, 109 N.J. at 369-370, 537 A.2d 667.