# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1084-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

P.K.,

     Defendant-Appellant.

_____

> Argued September 23, 2019 – Decided November 8, 2019
>
> Before Judges Sumners, Geiger and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-05-0539.
>
> Tamar Yaer Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yaer Lerer, of counsel and on the briefs).
>
> Joie D. Piderit, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney; Nancy Anne

Hulett, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After defendant P.K.'s first trial resulted in a mistrial, a second jury convicted him of second-degree sexual assault upon a child less than thirteen years of age, contrary to N.J.S.A. 2C:14-2(b), and third-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). On appeal, defendant raises the following six points for our consideration:

> POINT I
>
> THE ADMISSION OF REPETITIVE, CORROBORATIVE HEARSAY STATEMENTS, ADMITTED PURSUANT TO THE TENDER YEARS EXCEPTION, WAS CUMULATIVE, UNDULY PREJUDICIAL, AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.
>
> POINT II
>
> BECAUSE THE DIVISION OF YOUTH AND FAMILY SERVICES CASEWORKERS DESTROYED THEIR INTERVIEW NOTES, DEFENDANT WAS ENTITLED TO AN ADVERSE INFERENCE CHARGE. THE TRIAL COURT'S REFUSAL TO GIVE THAT CHARGE WAS REVERSIBLE ERROR.
>
> POINT III
>
> THE EXCLUSION OF STATEMENTS MADE BY THE COMPLAINANT'S SISTER THAT A FAMILY

2

MEMBER MOLESTED HER PREVENTED
DEFENDANT FROM PRESENTING A COMPLETE
DEFENSE AND NECESSITATES REVERSAL OF
DEFENDANT'S CONVICTIONS.

POINT IV

TESTIMONY THAT FALSE DISCLOSURES ARE
NEVER MADE WHEN A CHILD IS INTERVIEWED
USING THE TECHNIQUE EMPLOYED IN THIS
CASE WAS INAPPROPRIATE OPINION
TESTIMONY. ITS ADMISSION NECESSITATES
REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT V

EVEN IF NONE OF THE ERRORS WOULD BE
SUFFICIENT TO WARRANT REVERSAL, THE
CUMULATIVE IMPACT OF THOSE ERRORS
DENIED DEFENDANT DUE PROCESS AND A
FAIR TRIAL.

POINT VI

DEFENDANT WAS DEPRIVED OF HIS RIGHT TO
UNCONFLICTED COUNSEL AT SENTENCING,
HIS SENTENCE IS EXCESSIVE, AND FINANCIAL
PENALTIES WERE IMPROPERLY IMPOSED
WITHOUT REGARD TO HIS ABILITY TO PAY.
FOR ALL THESE REASONS, A REMAND FOR
RESENTENCING IS REQUIRED.

We have considered the record against the relevant legal principles and

applicable standard of review and disagree with defendant's arguments

contained in Points I-V. Accordingly, we affirm his convictions. We do,

however, conclude that a remand is appropriate for the court to resentence defendant after appointing new counsel who is unencumbered by any potential conflict of interest.

## I.

The facts underlying defendant's convictions relate to an incident where he sexually assaulted then six-year-old S.W. (Sarah).[1] At the time of the assault, Sarah and her younger sister, then five-year-old J.W. (Jennifer), lived with their mother M.F. (Mary) and maternal grandfather. Mary and the children often visited Mary's friend, C.P. (Charlotte), who lived in an apartment in South River and babysat the children.

On December 14, 2013, Mary, Sarah, and Jennifer went to Charlotte's apartment to eat dinner. When they arrived at the apartment, Charlotte asked if her friend, K.D. (Katy), and her boyfriend, defendant, could join them. Mary agreed, as Sarah and Jennifer were "familiar" with Katy and defendant.

Defendant and Katy arrived at Charlotte's apartment while Mary was cooking dinner. At one end of the small apartment was Charlotte's bedroom and

---

[1] We use pseudonyms for S.W., J.W., M.F., C.P., B.D., and K.D. to protect their privacy and preserve the confidentiality of these proceedings. N.J.S.A. 2A:82-46(a); R. 1:38-3(c)(9).

A-1084-17T1

a spare bedroom.  A long hallway led from the bedrooms to a bathroom and the kitchen.  While Mary was cooking dinner in the kitchen, Sarah and Jennifer played in the spare bedroom.  At times, Mary left the kitchen to smoke cigarettes in Charlotte's bedroom with the door closed, and Charlotte and Katy joined her.

At one point in the evening, defendant was in the spare room with the children watching a movie while Mary, Charlotte, and Katy were in the kitchen. Jennifer sat on "the front of the bed," closest to the television, Sarah sat behind her "in the middle of the bed," and defendant sat close behind Sarah.  As they watched the movie, defendant picked Sarah up under her armpits, pulled her onto his lap, and began "rubbing" her in her vaginal area with his hand.  Only after Sarah repeatedly told defendant to stop did defendant cease rubbing Sarah's vaginal area.

Mary and Charlotte then entered the spare bedroom.  Sarah did not tell Mary about the incident because she was "scared to tell [Mary] while [defendant] was still in the room."  Afterwards, the group ate dinner together without incident, and defendant and Katy left.

Approximately one week later, Mary, Sarah, and Jennifer returned to Charlotte's apartment.  As they were sitting in Charlotte's bedroom, Charlotte saw defendant's car approach the parking lot from her window and announced,

5

"[o]h, [defendant is] here." Mary observed Sarah's "body language [change]" and asked her what was wrong, to which Sarah responded, "why does [defendant] like naked people?" When Mary asked Sarah why she asked that, Sarah stated that defendant touched her, and then pointed to her vaginal area. Mary asked Sarah if she was sure this happened, and Sarah responded "yeah."

When defendant entered the apartment, Mary brought him to the spare bedroom and "let him know that [Sarah] [said] . . . he tried to touch her." After they spoke for approximately two minutes, Charlotte asked defendant to leave. Defendant left, and Mary told Sarah that her allegation was "very serious," and would have to be reported.

Mary, however, did not immediately report the incident. At the second trial, she testified that she failed to inform the police right away because:

> At the time[,] . . . I was dealing with a [Division of Family Services (DYFS)] case. I had willingly given up the children because I had gotten into an accident and hurt my leg and I couldn't take care of them anymore . . . . So, when my leg started getting better[,] . . . I was dealing with getting the custody back. There was a [c]ourt date set . . . to finalize the custody . . . [and] I was scared at that time that if I had reported this, that DYFS would find me as [an] unfit parent . . . .

Mary stated she planned to report the allegation to the police after she regained full custody. On December 29, 2013, however, Mary and her boyfriend

A-1084-17T1

at the time, B.D. (Bobby), were at Charlotte's apartment when Mary informed Bobby about Sarah's allegation. Mary told him that she wanted to wait until she regained custody of the children before reporting the incident. At that point, Bobby became "very upset and angry . . . because he felt that . . . [they] needed to tell the police right away." Their argument became physical, the police "were called for a noise disturbance," and Mary was arrested for simple assault and then brought to the hospital.

Sergeant Jennifer Novak, one of the officers that responded to the disturbance, spoke with Bobby, who informed her of the "allegation of child abuse." When Novak questioned Mary at Charlotte's apartment and at police headquarters about the allegation, Mary "wouldn't admit [that] anything that [Bobby] was saying [was] truthful."

After Mary was released from the hospital, she returned to Charlotte's apartment. Shortly afterward, the police arrived at the apartment and brought Mary and Charlotte to police headquarters to question them about the sexual assault allegation.

Later that night, Sharyn Walz, an intake supervisor with the now Division of Child Protection and Permanency (Division), and a worker in the Special Response Unit, which is responsible for "respond[ing] to child abuse and neglect

allegations after hours," received a referral for the sexual abuse allegations involving Sarah. Walz contacted her partner, Michelle Mason, and they immediately went to the residence of Sarah's and Jennifer's paternal grandmother, where the children were staying for the weekend.

Walz and Mason spoke with Sarah and began asking her a series of open-ended questions. After Walz asked Sarah if "anything happened with [defendant]," Sarah responded that defendant "touched her." When asked where defendant touched her, Sarah "pointed to her vaginal area." Sarah informed Walz that defendant "did not touch [Jennifer], but he did touch her twice . . . before dinner and then again . . . after dinner." Sarah also stated that Jennifer "saw [defendant] touch her."

Both Walz and Mason took notes during the interview and used them to write their final reports, which they completed on the day of the interview. Once the reports were written, they shredded their notes, which Walz testified was Division "policy."

After the interview, Walz and Mason contacted the office of the Middlesex County Prosecutor. Later that day, Sarah and Jennifer were brought to the prosecutor's office for a taped interview with Detective Karleen Duca. Duca testified during defendant's second trial that she received training at

Finding Words, "which is a training for law enforcement officers and [Division] workers on a method to interview children that is not leading or suggestive in any manner."

During the interview, Sarah told Duca that she did not like touches to "the vagina and the butt." When asked if she had been touched in those areas, Sarah responded "yeah," and added that she "told [defendant] to stop, but he wouldn't stop." Sarah also stated that defendant touched her "[t]wo times . . . in the same day."

On January 30, 2014, Frances B. Pelliccia, M.D., interviewed Sarah. Dr. Pelliccia testified that Sarah informed her that she was touched "five times before lunch, [and] two times after lunch." During the interview, Sarah "identified [defendant] by name [as] the person who . . . touched her."

Approximately a year after defendant's indictment, the State sought a pre-trial ruling deeming Sarah's repeated out-of-court statements to Mary, Charlotte, Walz, Mason, and Duca admissible under the "tender years" exception. See N.J.R.E. 803(c)(27). A motion judge, who was neither the first nor second trial judge, conducted an evidentiary hearing after which she issued a written opinion and conforming order granting the State's motion.

The court first acknowledged that "[i]n determining whether a statement proffered under N.J.R.E. 803(c)(27) is admissible, the court must consider the 'totality of the circumstances' surrounding the statement to determine the statement's trustworthiness." (quoting State v. R.M., 245 N.J. Super. 504, 517-18 (App. Div. 1991)). The court recognized, however, that the "admissibility of repetitive corroborative statements admitted under the . . . exception [was] nevertheless subject to N.J.R.E. 403, and thus the probative value of the corroborative statements must not be outweighed by their prejudicial effect."

The court then found that "based on the totality of the circumstances, [Sarah's] statements to [Mary], [Charlotte], and [i]nvestigators, all contained significant indicia of reliability, and thus [were] trustworthy and reliable." The court also determined there was no "support [for] [d]efendant's claim that [Sarah's] statements were contradictory in nature." The court further found that despite defendant's assertion that the delay in reporting the incident may have caused manipulation of Sarah's statements, there was "no indicia of unreliability given that the testimony provided to [the] [c]ourt indicate[d] there were several repetitive corroborated statements made, which indicated that [Sarah] did not speak to anyone besides the witnesses and no witness indicated that they spoke with [Sarah], other than the time to which they testified."

A-1084-17T1

The court also noted "that given the tactics, techniques, and procedures employed by . . . Duca in conducting the interview, the interview lends credence to the fact that [Sarah's] statements were not only reliable, but also consistent with the information that she had provided to her mother and the caseworkers." The court concluded that "based on the lack of motive to fabricate in this case, [Sarah's] age, the manner in which the interrogation occurred, and constant corroborative statements," Sarah's hearsay allegations satisfied N.J.R.E. 803(c)(27).

After the first jury advised the court that "[t]hrough a series of discussions and knowledge [they had] not been able to come to a unified verdict," the court declared a mistrial. At the second trial, the State presented the live testimony of Sarah, Mary, Walz, Mason, and Duca. The State also played the videotaped statement Sarah gave to Duca. Defendant called a single witness, Dr. Pelliccia.

As noted, the second jury convicted defendant on both counts of the indictment. Thereafter, defendant filed a motion for a judgment of acquittal or, alternatively, a new trial. After hearing oral arguments, the court denied both motions.

At sentencing, the court merged count two with count one and sentenced defendant to a nine-year term of incarceration, subject to an eighty-five percent

11

period of parole ineligibility pursuant to N.J.S.A. 2C:43-7.2. Additionally, the court imposed fees and penalties, including an $800 statewide sexual assault nurse examiner program penalty, $100 sexual offender's surcharge, and $1000 sex crime victim treatment fund (SCVTF) penalty. This appeal followed.

II.

With respect to defendant's first point on appeal, he acknowledges that although "some amount of out-of-court hearsay would have been permissible," he asserts that the court violated N.J.R.E. 403 by allowing into evidence Sarah's statements in "six different forms." Specifically, he contends that the introduction of Sarah's hearsay allegations: 1) by Mary, Walz and Mason, 2) in the videotaped interview with Sergeant Duca, 3) by a "physician that examined her,"[2] and 4) through her direct testimony, was "prejudicial" and "cumulative." We find defendant's arguments without merit.

The tender years hearsay exception, N.J.R.E. 803(c)(27), permits hearsay statements from allegedly sexually abused children to be admitted in certain circumstances, such as where the court finds "that on the basis of the time,

---

[2] In his merits brief, defendant fails to specifically identify Dr. Pelliccia as the "physician that examined [Sarah]." As we cannot discern any other medical professional who testified at the second trial, we assume defendant's reference is to Dr. Pelliccia.

content and circumstances of the statement there is a probability that the statement is trustworthy . . . ." See State v. D.R., 109 N.J. 348, 378 (1988). On appeal, defendant does not challenge the motion or trial judges' decisions to admit any of Sarah's hearsay allegations under the tender years exception.

As defendant's N.J.R.E. 403 argument was not raised at any time during defendant's second trial, we review the issue for plain error. Under the plain error standard, we disregard any error or omission by the trial court "unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." R. 2:10-2; see also State v. Santamaria, 236 N.J. 390, 404 (2019). "To warrant reversal[,] . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

Defendant appears to argue that the harmful error standard of review applies because he unsuccessfully challenged the admissibility of Sarah's statements under the tender years exception before the motion judge, and also objected, in part, to the cumulative nature of the statements during his first trial.[3]

_____

[3] At the first trial, during the direct examination of Mason, defendant objected on the grounds that N.J.R.E. 803(c)(27) "[does not] allow repetition of the same

Again, we disagree.

The record clearly establishes that defendant did not object during the second trial to the testimony of Sarah, Mary, Walz, Mason, Duca, and Pelliccia on N.J.R.E. 403 grounds. Further, the motion judge's pre-trial ruling addressed the admissibility of the testimony under the tender years exception but expressly acknowledged that the admissibility of Sarah's hearsay allegations was still subject to N.J.R.E. 403. As such, neither the motion judge nor the second trial judge addressed the admissibility of Sarah's allegations under N.J.R.E. 403.[4]

With respect to child sexual abuse cases, courts have recognized that "testimony by the victim is often the indispensable element of the prosecution's case," as "[f]requently, there is no visible physical evidence that acts of sexual molestation have occurred," and a "victim's account of the sexual abuse may be the best and sometimes the only evidence that a sexual assault has taken place." D.R., 109 N.J. at 358-59. Trial judges, however, "must serve as gatekeepers

_____

interview, of the same situation by two different witnesses . . . [and the jury was] already hearing no less than four versions of what was said at different times." The first trial judge "noted [the objection] for the record," but permitted the testimony.

[4] We observe that because the harmful error standard requires a court to determine whether "there is a reasonable doubt as to whether the . . . error contributed to the verdict," our decision here would be unchanged under that standard. State v. Macon, 57 N.J. 325, 40 (1971).

when repetitive corroborating hearsay evidence is proffered pursuant to [N.J.R.E] 803(c)(27)." State v. Smith, 158 N.J. 376, 391 (1999). Accordingly, "a trial court should be cognizant of its right under N.J.R.E. 403, to exclude evidence if it finds[,] in its discretion, that the prejudicial value of that evidence substantially outweighs its probative value." Ibid. (quoting State v. D.G., 157 N.J. 112, 128 (1999)).

N.J.R.E. 403 provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." Trial judges have "broad discretion to exclude evidence as unduly prejudicial pursuant to N.J.R.E. 403." State v. Nantambu, 221 N.J. 390, 402 (2015). "[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." Ibid. (quoting State v. Harris, 209 N.J. 431, 439 (2012)).

Here, the jury considered the video statement of Sarah recorded by Duca in addition to her live testimony at trial. In State v. Burr, 392 N.J. Super. 538, 573 (App. Div. 2007), we considered, and rejected, the defendant's argument that a video was unduly prejudicial as a "repetitive, corroborative statement of

[the child's] trial testimony." Id. at 564. We determined the tape to have probative value as being "closer in time to the alleged sexual assault than the trial" and because it demonstrated that the statements made to the prosecutor's office were "largely consistent with those made . . . at trial." Id. at 573. We find nothing in the current record preventing application of the Burr reasoning and holding here.

The four additional statements admitted without objection were from Mary, Walz, Mason, and Dr. Pelliccia. In her testimony regarding the incident, Mary stated that Sarah asked her "why . . . [defendant] like[s] naked people" and stated that defendant "had tried to touch [her]." When asked where defendant allegedly touched her, Mary testified that Sarah "pointed at her vagina." In addition to corroborating Sarah's statements, Mary's testimony explained the reasons why she delayed reporting the incident, and her relationship with Bobby.

Walz and Mason's testimonies were very brief. Walz testified that she asked open-ended questions and that Sarah informed Walz that defendant "did not touch [Jennifer], but did touch [Sarah] twice . . . before dinner and then . . . after dinner," and that Jennifer "saw [defendant] touch her."

Similarly, Mason testified that Sarah informed Walz that defendant "touched – scratched or touched [her] vagina, like a scratch, two times on the

16

same day . . . [and that] it was snowing and it was before Christmas."  Both witnesses further testified regarding the circumstances surrounding their response to Sarah's paternal grandmother's home, their training and the subsequent contact with the prosecutor's office, and temporary placement of the children, and provided the jury with an understanding of the circumstances surrounding the State's investigation and Sarah's corroborative statements.

As to Dr. Pelliccia, we first note that she was called by defendant, not the State.  Dr. Pelliccia's direct testimony totaled seven questions, inclusive of her background.  The only substantive inquiry made by defense counsel was Sarah's statement that she was touched seven times by defendant, "five times before lunch, two times after lunch."  Defendant clearly cannot claim prejudice, under N.J.R.E. 403 or otherwise, based on testimony his counsel affirmatively elicited for the clear purpose to show inconsistencies in Sarah's description of the incident.  We are therefore satisfied that no plain error occurred, nor any violation of N.J.R.E. 403, as a result of the jury considering Sarah's hearsay statements.  See State v. C.H., 264 N.J. Super. 112, 124 (App. Div. 1993) (permitting the testimony of six witnesses regarding statements made by the sexual abuse victim); State v. E. B., 348 N.J. Super. 336, 346 (App. Div. 2002)

(permitting the testimony of five witness statements pursuant to N.J.R.E. 803 (c)(27)).

We also cannot ignore that during the second trial, defendant affirmatively argued that multiple inconsistencies in Sarah's statements created sufficient reasonable doubt to warrant a not-guilty verdict. In this regard, Dr. Pelliccia was specifically called as a witness by defendant for this sole purpose. Further, defendant's counsel repeatedly stressed Sarah's purported inconsistencies when he stated in closing arguments that at one point, Sarah claimed the incident "happened when it was raining in the spring and summer, [but that] [e]very other version of it [was] in the winter when there [was] snow on the ground." Under these circumstances, we conclude that no error, let alone plain error, occurred when the trial court permitted the aforementioned statements upon questioning by defendant's counsel to be considered by the jury.

## III.

In his second point, defendant argues that the trial court committed reversible error when it failed to issue an adverse inference charge, consistent with the Model Jury Charges (Criminal), "Failure of Police to Preserve Notes" (eff. May 27, 2011) and State v. W.B., 205 N.J. 588 (2011). Specifically, defendant contends that because Walz and Mason were aware of an ongoing

criminal investigation and "acted as an adjunct of law enforcement" by "contact[ing] the prosecutor's office themselves and [observing the start of] the criminal investigation" at the prosecutor's office, they were obligated to retain, and not destroy, their interview notes prepared prior to creation of their final report. We disagree.

We initially observe that like defendant's first argument, he never requested that the trial court during his second trial issue an adverse inference charge. Rather, he raised the issue for the first time during his new trial application. Accordingly, we similarly analyze the issue under the plain error standard. R. 2:10-2.[5]

In State v. W.B., 205 N.J. 588, 607 (2011), our Supreme Court held that "law enforcement officers may not destroy contemporaneous notes of interviews and observations at the scene of a crime after producing their final reports." Ibid. (citing State v. Branch, 182 N.J. 338, 367 n.10 (2005); State v. Cook, 179 N.J. 533, 542 n.3 (2004)). The Court's reasoning acknowledged the direct connection between law enforcement during the investigatory phase of a crime and its prosecution, and determined that once "a case is referred to the prosecutor

_____

[5] Defendant's counsel in the first trial requested an adverse inference charge due to the destruction of the notes, which the court denied.

following arrest by a police officer as the initial process, or on a complaint by a police officer, local law enforcement [becomes] part of the prosecutor's office for discovery purposes." Id. at 608 (citing R. 3:3-1; R. 3:4-1). Accordingly, "[i]f notes of a law enforcement officer are lost or destroyed before trial, a defendant, upon request, may be entitled to an adverse inference charge molded, after conference with counsel, to the facts of the case." Id. at 608-09.

The W.B. court recognized, however, that "[e]very opportunity when contemporaneous notes are lost or destroyed does not necessitate an adverse inference charge." Id. at 609 n.10 (citing State v. P.S., 202 N.J. 232 (2010)).[6] In that case, the defendant was not entitled to an adverse inference charge "because defendant neither requested an adverse inference charge before the final jury instructions were given, nor raised the issue before filing his motion for a new trial . . . ." Id. at 609.

First, we reject defendant's argument that Walz and Mason acted "as an arm of law enforcement." When Walz interviewed Sarah at her grandmother's house, she was responding on behalf of the Division in an emergency setting and described her investigation as "preliminary," the purpose of which was to

---

[6] In P.S., the court determined that the production of notes from an investigator's forensic interview was unnecessary where sufficient evidence of reliability existed in the record to deem the child's statement trustworthy. Id. at 254.

ensure Sarah's safety generally, and in her grandmother's home. She specifically stated that she did not consider herself a member of "law enforcement," but described her responsibilities as "engag[ing] the family and . . . cooperat[ing] with law enforcement" as necessary. In this regard, she acknowledged that if she suspected a criminal act, she would contact the prosecutor's office.

Mason testified similarly. She stated that once Sarah disclosed that defendant sexually assaulted her, they were obligated to contact the prosecutor's office as the prosecutor was responsible for the "criminal aspect" of the investigation, and once the prosecutor's office is contacted she "take[s] a step back" because they act as "lead investigators at that point."

Neither Mason's nor Walz's role bear any similarity to the law enforcement officers in W.B. As noted, both worked for the Division and were responding to a referral to ensure the safety of Sarah and her sister in their grandmother's home. After Sarah informed them of the incident, they promptly contacted the prosecutor's office. Mason testified that at the prosecutor's office, she "observed the interview[s] of [Sarah] [and Jennifer] via closed circuit TV," but had no "other responsibilities at the [p]rosecutor's [o]ffice."

Second, as the motion judge concluded, Sarah's statements were sufficiently reliable to deem them trustworthy. See P.S., 202 N.J. at 254.

21

Indeed, defendant makes no contrary claim on appeal, as he does not challenge the motion judge's decision on that point.

We find defendant's reliance on State v. Helewa, 223 N.J. Super. 40 (App. Div. 1988) misplaced. In that case, we held that a Division caseworker "must be equated with that of a law enforcement officer for purposes of triggering Miranda" when conducting a custodial interview. Id. at 47. Here, neither Mason nor Walz were conducting a custodial interview, and although we acknowledge the ordinary and necessary relationship that exists between the Division and law enforcement in their day-to-day functioning, neither caseworker here can fairly be characterized as law enforcement officers, nor agents of the prosecutor or police, for the reasons detailed.

Finally, like in W.B., defendant failed to request an adverse inference charge at his second trial, instead raising the issue for the first time in his new trial application. Thus, we cannot conclude under these circumstances that an adverse inference charge was warranted due to Mason and Walz destroying their interview notes prior to incorporating them into their final report.

IV.

In defendant's third point, he argues that contrary to the first trial judge, the second trial judge improperly precluded defendant from introducing

22

statements from Jennifer to Duca that her "abuelo," or grandfather, improperly touched her.[7]  According to defendant, the statements should have been admitted for the non-hearsay purpose that:  1) Sarah "present[ed] a mimicking theory, that [she] had learned about sexual contact from her sister's statements and was repeating them in her own allegations"; 2) "the family fabricated a story of sexual assault by [defendant] to divert suspicion of misconduct from a family member . . . especially since [Mary] was seeking custody . . . and the person [Jennifer] accused of molesting her was her mother's boyfriend"; and 3) the State "fail[ed] to follow up on [Jennifer's] allegations," which would "impeach the thoroughness of the investigation" into Sarah's claims.

During the second trial, the court sustained the State's objection to the proposed testimony on hearsay grounds, and also concluded it was speculative. Defendant argues that the second trial judge's decision to exclude the testimony regarding Jennifer's allegations was in error, as the first trial judge's ruling was the law of the case and was admissible for the aforementioned valid non-hearsay purposes.  See N.J.R.E. 801(c).  We disagree with both arguments.

---

[7] It was not entirely clear from the trial record if Jennifer was referring to one or two individuals when she described her "abuelo."  For example, one of the people identified was her mother's boyfriend.

23

"The 'law of the case' doctrine is a discretionary rule . . . [that] is 'restricted to preventing relitigation of the same issue in the same suit.'" State v. Munoz, 340 N.J. Super. 204, 219 (App. Div. 2001) (citation omitted) (quoting Slowinski v. Valley Nat'l Bank, 264 N.J. Super. 172, 180-81 (App. Div. 1993)). Accordingly, "the doctrine is to be applied flexibly in the interest of justice, even if it requires relitigation of an earlier ruling prior to final judgment." Id. at 220 (citing Southport Dev. Group, Inc. v. Twp. of Wall, 295 N.J. Super. 421, 430 (Law Div. 1996)). Further, when there is a mistrial, "the admissibility of evidence is rendered nugatory, in which case 'law of the case' does not bind a subsequent judge to the same ruling." Ibid. (citing State v. Hale, 127 N.J. Super. 407, 412-13 (App. Div. 1974)). "The discretionary nature of the . . . doctrine calls upon a judge to balance deference toward a prior ruling with concern for the pursuit of justice, especially, the search for the truth." Ibid. (citing State v. Reldan, 100 N.J. 187, 205 (1985)).

Here, it appears that defendant was permitted to introduce evidence of Jennifer's out-of-court statements regarding her grandfather at the first trial. Due to the mistrial, the second judge was not required to abide by the first judge's evidentiary rulings. Accordingly, it was within the second judge's discretion to determine whether Jennifer's statements were admissible.

As noted, defendant argues that he sought to introduce Jennifer's statements not to show that her "abuelo" molested Jennifer, but to show that Sarah may have been seeking attention by making the allegations against defendant, and for the other stated non-hearsay purposes.[8] We need not address whether the second trial judge correctly determined that the proffered testimony was inadmissible hearsay, as we agree with the court's implicit N.J.R.E. 403 ruling that defendant's theories, including that Sarah mimicked Jennifer's allegation for attention, was speculative, without foundation, unsupported by other admissible evidence in the record, and risked confusing the jury. The court's evidentiary rulings are amply supported by the record and are entitled to our deference. See Buda, 195 N.J. at 294 ("Trial court evidentiary determinations are subject to limited appellate scrutiny, as they are reviewed under the abuse of discretion standard."). Finally, we are satisfied that any error

---

[8] As noted, after the State objected to Jennifer's statements on hearsay grounds, defendant argued that Jennifer's comments were relevant as they supported defendant's mimicking theory and the fact that the State failed to properly investigate Sarah's claims. Defendant did not, however, specifically claim the proposed testimony was admissible as non-hearsay. See N.J.R.E. 801(c). Although we could consider defendant's failure to reference N.J.R.E. 801(c) in the trial court a waiver of his arguments on appeal, we nevertheless discuss the merits of defendant's arguments.

in the court's evidentiary decision on this point did not "contribute[] to the verdict." Macon, 57 N.J. at 340.

V.

In defendant's fourth point, he argues that the second trial judge committed error when he allowed Duca to inappropriately offer opinion testimony "that went straight to the truth of [Sarah]'s allegations . . . ." Specifically, defendant contends Duca's testimony that her interview technique "allows for a disclosure [of abuse from a child] to be made if a child was abused," was inappropriate. Defendant further asserts that "Duca provided . . . expert testimony without being qualified as an expert." As defendant, again, raises the issue for the first time on appeal, we apply the plain error standard of review, see State v. Robinson, 200 N.J. 1, 20 (2009), and conclude these arguments are sufficiently without merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2).

Lay witnesses are generally not entitled to offer opinion testimony unless "it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). Further, neither experts nor lay witnesses are permitted to "opine on the credibility of parties or witnesses." Id. at 453.

Here, contrary to defendant's assertion, Duca's testimony was not improper lay opinion testimony. Rather, she explained that the Finding Words program was designed to train interviewers to use "a method to interview children that is not leading or suggestive in any manner." She explained that she asked "open-ended questions" so that the children could provide as much information as possible. Based on her experience interviewing children, Duca testified that she had "experienced interviews where disclosures were not made by children." Additionally, she testified that the interview technique used "allows for a disclosure [of abuse from a child] to be made if a child was abused."

Defendant misconstrues Duca's testimony to suggest that "the interview technique used in the recording . . . was reliable and resulted only in accurate disclosures of sexual abuse." Duca, however, merely stated that the technique is designed to permit children to disclose their abuse by answering non-leading, open-ended questions. She did not state that children that were abused always disclosed it, or that children fabricating abuse never disclosed abuse.

Further, we note that the court instructed the jury that they were "the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony of each witness." We have no reason to

27

conclude that the jury did not heed the court's instructions, and we find no support that the admission of Duca's testimony regarding her interview of Sarah, and specifically the techniques she employed, was in any way erroneous or that it was "clearly capable of producing an unjust result." R. 2:10-2.

## VI.

Defendant next argues that if this court determines that the "series of errors," detailed in points I-IV, are individually insufficient to warrant reversal, the effect of each error in the aggregate denied defendant a fair trial. "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). As we have discussed, defendant has not demonstrated that any prejudicial error occurred at trial. The principle of cumulative error, therefore, has no application here. See State v. Weaver, 219 N.J. 131, 155 (2014) ("If a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair.").

## VII.

Finally, defendant maintains that errors during the sentencing phase necessitate a remand for resentencing. First, he asserts that when "it was

28

revealed that [defendant] had filed an ethics complaint against his attorney . . . the sentencing should have been adjourned" and that we should "remand for a new sentencing in which defendant is 'represented by unencumbered counsel.'" (quoting State v. Hayes, 205 N.J. 522, 541 (2011)).  Second, he contends the court "improperly found . . . aggravating factors [four and six], resulting in an excessive term."  Third, he argues that the SCVTF penalty "was imposed without regard to [defendant's] ability to pay."  We agree with defendant that a remand is necessary so that defendant may be appointed new "unencumbered [sentencing] counsel," and accordingly vacate defendant's sentence and remand for further proceedings.

At sentencing, the following colloquy took place between defendant's counsel and the court:

> [DEFENDANT'S COUNSEL]:  Judge, I'm going to be brief.  I feel that my comments have to be measured, especially because when an ethics violation is filed –
>
> THE COURT:  You were charged with an ethics violation?
>
> [DEFENDANT'S COUNSEL]:  He's filed an ethics violation and I only say that because I – you know, you're on a fence, you don't know what to say or not to say.  That's – it doesn't happen often, but that's the situation now.  I'll rely heavily on the sentencing letter I wrote . . . .

[(emphasis added).]

After taking a brief recess to review the referenced sentencing letter and considering "over a dozen letters . . . submitted on behalf of defendant" that defendant's counsel previously provided, the court considered the State's sentencing arguments. The court also gave defendant an opportunity to speak, to which defendant responded "[he] [had] nothing to say . . . ." The court then proceeded to sentencing.

It is well-established that a defendant has the right to counsel at sentencing. See State v. Jenkins, 32 N.J. 109, 112 (1960); accord State v. Briggs, 349 N.J. Super. 496, 501 (App. Div. 2002). Further, "a criminal defendant has the right to counsel 'whose representation is unimpaired and whose loyalty is undivided.'" State v. Alexander, 403 N.J. Super. 250, 255 (App. Div. 2008) (quoting State v. Murray, 162 N.J. 240, 249 (2000)). A "defendant's right to effective assistance of counsel includes both adequate representation and right to attorney's conflict-free, undivided loyalty." State ex rel. S.G., 175 N.J. 132, 139 (2003) (citing U.S. v. Moscony, 927 F.2d 742, 748 (3d Cir. 1991)).

We have previously vacated a sentence when a trial court failed to address a conflict between a defendant and his counsel. In State v. Vasquez, 432 N.J. Super. 354 (App. Div. 2013), the defendant requested an adjournment during the

sentencing proceeding because he "was in the process of retaining new counsel." Id. at 356. The defendant further informed the sentencing court that he could not "accept [his] sentence because [he did not] think that [he had] legal representation at th[at] moment," and his counsel stated he was "in a conflict . . . because the [defendant was] saying he [didn't] want [counsel] to represent him and [defendant] [would not] cooperate . . . with sentencing to go over the presentence report . . . ." Id. at 357. Despite both defendant and his counsel's reluctance to proceed with sentencing, and the defendant's specific request for an adjournment, the trial court nevertheless sentenced the defendant. Id. at 357-58.

The Vasquez court vacated the sentence and remanded for further proceedings because the court failed to address defense counsel's concern that he was "in a conflict, [as] defendant had expressed his desire that defense counsel no longer represent him and defendant was not cooperating with [counsel] . . . ." Id. at 358-60. Additionally, defendant "expressed his agreement that he no longer wanted his current defense counsel to represent him." Id. at 359.

The court concluded that once the sentencing court denied the adjournment request, it improperly "proceeded with sentencing without

31

establishing any record that defendant had knowingly, intelligently[,] and voluntarily waived his right to counsel and had elected to proceed with sentencing, pro se." Ibid. The Vasquez court explained that the sentencing court should have made appropriate findings to determine "whether a genuine conflict of interest existed, and, if so, grant[ed] an adjournment, . . . [or] if the court found no conflict, it could have ordered defense counsel to proceed to vigorously represent defendant in seeking withdrawal of the guilty pleas and, if that application were denied, then with equal vigor, advocate for the best possible sentencing outcome." Id. at 360.

We acknowledge that, unlike in Vasquez, defendant never made an adjournment request at sentencing, nor did defendant or his counsel advise the court of the details of the ethics complaint. It is clear, however, from counsel's statements at sentencing that the filed ethics complaint affected his ability to represent defendant zealously. Indeed, as counsel informed the sentencing court, he believed that because of the ethics complaint, his "comments [had] to be measured" and he was "on a fence" and did not "know what to say or not to say." We are satisfied that these statements sufficiently question whether

defendant received "adequate representation" that was "conflict-free" and with "undivided loyalty." S.G., 175 N.J. at 140 (2003).[9]

In light of our decision to remand the matter for the appointment of new, unencumbered and conflict-free sentencing counsel, we do not address defendant's arguments that the court improperly weighed the aggravating and mitigating factors, or that the court failed to consider, or make necessary factual findings, regarding defendant's ability to pay the assessed fines and penalties. On remand, defendant's new counsel may raise these, and any other applicable arguments, affecting defendant's sentence, prior to resentencing. The court shall consider the nature of the offense and defendant's ability to pay when assessing the SCVTF, and shall provide a statement of reasons for the amount imposed. State v. Bolvito, 217 N.J. 221, 233-35 (2014).

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] The facts here are distinguishable from those in State v. Coclough, 459 N.J. Super. 45 (App. Div. 2019). In that case, we affirmed a sentence despite a defendant's threats to his counsel because prior to sentencing both defendant and counsel indicated they "[were] ready to proceed" with sentencing. We also noted that the fact that a "defendant [had] a conflict with his attorney does not necessarily mean his attorney had a conflict of interest." Id. at 56. Here, unlike in Coclough, counsel acknowledged that defendant's filed grievance restrained his ability to advocate on his behalf at sentencing.

A-1084-17T1