# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2746-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

A.N.A.,[1]

    Defendant-Appellant.

_____

> Submitted February 3, 2026 – Decided March 16, 2026
>
> Before Judges Gilson, Perez Friscia, and Vinci.
>
> On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 20-02-0367.
>
> Jennifer N. Sellitti, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).
>
> William E. Reynolds, Atlantic County Prosecutor, attorney for respondent (Linda A. Shashoua, Attorney, Special Litigation Unit, of counsel and on the brief; Courtney Cittadini, Section Chief, on the brief).

---

[1] We use initials to protect the privacy of the victim. See R. 1:38-3(c)(9), (12).

PER CURIAM

After a jury trial, defendant A.N.A. appeals from convictions for sexual assault and endangering the welfare of a child. Defendant challenges the court's admission of testimonial evidence related to his actions before the sexual assault, fresh complaint, medical diagnosis under N.J.R.E. 803(c)(4), and the tender-years exception under N.J.R.E. 803(c)(27). Defendant also alleges the court erred in the sentence imposed. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

We summarize the salient facts adduced at the motion hearing and trial relevant to defendant's issues on appeal. On September 15, 2019, C.C. reported to her mother, A.M., that her stepfather, defendant, had touched her "private part," referring to her vagina. The same day, A.M. reported the sexual assault to the Galloway Township Police Department (GTPD). During the investigation, GTPD Detective Matthew Worth met with C.C. and conducted a video-recorded interview. Thereafter, C.C. was referred to the CARES Institute for a medical evaluation, which was performed by Martin Finkel, M.D.

On February 25, 2020, a grand jury charged defendant with second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count one); fourth-degree lewdness,

N.J.S.A. 2C:14-4(b)(1) (count two); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) and (2), (respectively, counts three and four).

On September 17, 2023, the State moved to admit the following evidence at trial: (1) C.C.'s fresh-complaint testimony to A.M.; (2) C.C.'s statements given to Dr. Finkel in support of medical diagnosis and treatment; and (3) C.C.'s interview statement to Worth under the tender-years exception. After the court held two evidentiary hearings, it issued one order accompanied by a comprehensive written decision addressing the motions.

At the first hearing, the court addressed the State's fresh-complaint and medical diagnosis motions. The State called A.M. regarding C.C.'s fresh-complaint statements made on the day of the incident. A.M. testified that on the morning of September 15, 2019, she met C.C. and N.A., her stepson, "at the top of the stairs above [A.M.'s] bedroom." The children were both "visibly upset" and C.C. revealed defendant had "touched her [o]n her private part," clarifying it was her vagina. A.M. was "shocked," told the children to go upstairs, and then confronted defendant. A.M. conveyed she had a close relationship with her daughter and on the day of the incident, C.C. was eight years old and in third grade.

A-2746-23

After cross-examining A.M., defense counsel advised the court she agreed "based on the legal [fresh-complaint] standard that [the testimony] would qualify as a valid fresh[-]complaint evidence." Defense counsel requested "the [c]ourt to set reasonable parameters" regarding "the details of the testimony" admitted to the jury.

The court granted the State's motion to admit C.C.'s fresh-complaint testimony to A.M., but limited the testimony at trial to C.C.'s first disclosure about defendant's sexual assault. It found C.C. had "willingly" and "spontaneously" provided her mother a "detailed description" of defendant's actions, "without any prompting," and that A.M. did not "interrogate her about what happened." The court reasoned the statement was not being admitted to corroborate C.C.'s testimony but rather to dispel an inference regarding silence. Noting that juvenile victims are often reluctant to report an offense, the court highlighted that admitting the statement negates fabrication.

Regarding the admission of C.C.'s medical diagnosis statements to Dr. Finkel under N.J.R.E. 803(c)(4), the State argued it was seeking to admit only C.C.'s statements "used to form a [treatment] opinion." Defense counsel acknowledged C.C.'s statements "probably . . . satisf[ied] the hearsay exception" but argued under an "[N.J.R.E.] 403 analysis" that they were inadmissible.

A-2746-23

Defense counsel contended that because the court was likely to admit the State's fresh-complaint and tender-years exception evidence, the admission of C.C.'s statements to Dr. Finkel was "unduly and substantially prejudicial," "cumulative," and repetitive.

The court granted the State's motion, finding the State met its burden to admit C.C.'s medical diagnosis statements under N.J.R.E. 803(c)(4), but limited the admission of evidence from the medical record to C.C.'s statements to Dr. Finkel used to determine if she "suffered psychological trauma from the incident." The court found the doctor examined C.C. and obtained the statements for "medical diagnosis and treatment," which permitted "trauma informed care." The court barred C.C.'s statements "relating to conversations between [her] mother and stepfather and details about their personal lives."

Before the trial began, on September 26, 2023, the court revisited the admission of C.C.'s statements to Dr. Finkel. The court entertained further argument from defense counsel and ordered the State to redact the overly prejudicial comments, such as "I thought, oh, my God, I[ am] going to have a child" and "I woke up in time when he first started doing it."

At the second evidentiary hearing, the court addressed the State's motion to admit C.C.'s interview statement under the tender-years exception. Worth

testified that he conducted a video-recorded interview of C.C. on September 17, 2019, with Sergeant Ryan Goehringer present.  He recalled C.C. was eight years old at the time.  Worth explained his specialized training in interviewing suspected child abuse victims.  He had completed a forty-hour course on conducting a child interview regarding allegations of "sexual abuse, physical abuse, [or] neglect."  Worth was also trained on conducting "Finding Words forensic interviews" and had interviewed more than eighty children, ranging in age from two-and-a-half to seventeen years old.

Regarding how he conducted interviews, Worth described generally obtaining background information about the "family dynamic" and child.  He would inform the child they were in a "safe place" and not in trouble.  Based on his training, he would use an "easel board" and "anatomical dolls" to permit the child to explain what occurred.  He would "not ask leading questions" but would seek to allow the child to "open up and talk about" what happened.  Depending on the disclosure, Worth would contact other agencies, including referring a child to "a CARES [e]valuation with the CARES Institute."

Worth authenticated the video interview of C.C., and it was played for the court.  During the interview he confirmed C.C. understood to "tell . . . the truth."  She told Worth that she was asleep when defendant woke her up by "touching

6

[her] privacy." C.C. explained she had pajama pants on and was alone in her room when she felt "a [f]inger touching her private" area over her clothing. She saw defendant "had no pants" on and was wearing only a green shirt. C.C. could also see defendant's naked "butt." As defendant went to leave, he picked up her "pink sloth" stuffed animal and threw it at her, hitting C.C. in the face. She felt "scared" and angry. Shortly thereafter, she went to see her stepbrother, N.A., in the adjacent bedroom and report what occurred. She was crying and N.A. hugged her.

Later in the video-recorded statement, C.C. explained to Worth that soon after she went to speak to N.A., defendant came to see what was going on. C.C. told Worth she lied to defendant and said she "had a nightmare" and "a bad dream about [her] dad dying." After defendant left, she went and told her "mom what happened." Near the end of the interview, Worth told C.C. she was brave, because it "is not easy to talk about this stuff." C.C. responded that she was "actually used to talking about it because thousands of people are like, [t]ell me what happened" and she had told the "same story over and over again."

During argument, defense counsel objected to the admission of the interview primarily because C.C.'s statement—that she talked to "thousands" of people—"could be interpreted as people telling her what happened." Defense

7

counsel argued her statement was untrustworthy because it conveyed "potential . . . manipulation by adults ha[d] been ongoing," C.C. had acknowledged "sp[eaking] to a number of unknown others," and C.C. may have been "repeating something that [others] . . . reinforced to her [wa]s true."

The court granted the State's motion, finding the State had "satisfied the requirements for the . . . [tender-years] exception" and had provided defendant timely notice. After reciting the relevant factors, the court found C.C. was under twelve years old, was going to testify at trial, and had given a reliable statement. The incident occurred on September 15, 2019, and the interview was conducted two days later. The court reasoned the statement was trustworthy because C.C. "appeared calm," "responded to the questions," "spontaneous[ly]" answered the questions, provided a consistent "recollection and description of what occurred," and responded with specificity and age-commensurate language although she "appeared uncomfortable." Regarding C.C.'s alleged discussion with "thousands" of others, the court determined it was "an age[-]appropriate statement of exaggeration for an eight-year-old" and a review of the whole statement showed no suggestion C.C. was "influenced or manipulated."

At trial, C.C. testified she was twelve years old. She explained that on September 14, 2019, she went to sleep in her room after watching television.

She had stayed up past her bedtime and fell asleep at about 11:00 p.m. Her bedroom was on the second floor of the home she lived in with A.M., defendant, and N.A. N.A.'s bedroom was on the second floor near hers. A.M. and defendant had a bedroom in the basement.

C.C. slept alone in her room with the covers pulled up above her head. She woke up to see defendant "kneeling down" next to her and "touching" her in "a circular motion . . . around the top part of [her] private part." She explained that her "private part" was her vagina. She was wearing pajama bottoms and felt a sensation that "was[ not] soft, but it did[ not] hurt." Defendant "stopped when [they] made eye contact." C.C. stated defendant "did[ not] go in" to her vagina, but she saw his hand and felt his "finger, but . . . [did not] remember seeing the finger." While his hand was on "the private area" it was always "[o]n top" of her "pajama bottoms."

C.C. described feeling "like a smooth pebble, just like rolling on my vagina." She did not know how long it occurred while she was asleep but believed it lasted for "less than a second" after she woke up. Once she made "eye contact" with defendant, "[h]e picked up [her] pink sloth that fell off [her] bed, . . . threw it at [her] face[,] and then ran out of the room." As he left her bedroom, C.C. saw defendant had "no pants on" and "us[ed] his black boxers to

9 A-2746-23

cover hi[m]self." She could see his "green shirt" and naked "butt" "when he started running [toward] the hallway."

After the incident, C.C. "cried" and felt "scared because [she] did[ not] want to . . . break up the family." Minutes later, she went to tell N.A. what happened. While talking to her stepbrother, defendant "came into the room and . . . asked [C.C.] why [she] was crying." Because she "did[ not] want [defendant] to know that [she] knew what had happened, [she] told him [she] had a dream about [her] dad dying." C.C. recalled telling N.A. defendant "touched" her, she did not "know what to do," and was "scared."

C.C. explained they went "downstairs to" see her mom to tell "her what happened." After revealing what happened, C.C. recalled that A.M. told her "to go upstairs" to her "room and to lock [her] door." C.C. "went upstairs" and, because there was "no lock on [the] door," hid in her "closet and . . . held [the door] shut." After defendant left the house, she came out of the closet. C.C. recalled visiting a doctor but could not remember what happened at the examination. She recounted "l[]ying down on the table" and the doctor "talking to [her] mom."

On cross-examination, C.C. admitted the events were "a blur." When asked whether she waited in her room for a "few minutes" after the incident, she

A-2746-23

stated, "Yes." She also recalled hearing her mother and defendant "yelling at each other" while she was in the closet.

The State called Rachel Silliman-Cohen, M.D., with the consent of defense counsel, to testify in place of Dr. Finkel. While Dr. Finkel had conducted the CARES evaluation, he had retired and was in Scotland. Dr. Silliman-Cohen was the Director of the CARES Institute and testified about C.C.'s statements to Dr. Finkel. She explained that the CARES Institute is a multi-discipline institute of mental health providers that focuses on services and evaluations for children suspected of abuse or neglect. As a pediatrician, she conducted evaluations. Dr. Silliman-Cohen also explained the standard protocols and procedures for conducting a medical evaluation of a child. Dr. Silliman-Cohen had reviewed Dr. Finkel's medical records before testifying. Dr. Silliman-Cohen, under N.J.R.E. 803(c)(4), read portions of Dr. Finkel's medical report, which was partially "redacted or blocked out," with "no objection" by defendant.

Dr. Silliman-Cohen initially noted Dr. Finkel created the report "to diagnose and treat" C.C. based on "the concern that she may have been touched inappropriately." Dr. Silliman-Cohen read the pertinent part of the medical record regarding the initial "[h]istory obtained from [C.C.]" as follows:

11

I asked her if she knew why she was here to see me today, and she said 'to check if I am healthy.' I explained to her that one of [the] things I do that is a little different tha[n] most kids' doctors is every day I talk to kids like her when they have been able to tell about something that happened that could be confusing or difficult to understand by someone they know and they trust. I said that happens to a lot of kids. I asked if anything like that had ever happened to her. She said, 'Yes.' I asked if she found it hard to tell like a lot of kids do, and she said, 'Yes.' I asked her to explain to me why it was difficult for her to tell, and she said, 'I was scared if I told my mom right away he was just standing right there. I waited until my mom went upstairs to tell.' I asked if it was hard for her to tell for any other reason, and she said, 'I thought he would start yelling and make up lies.' I asked if he said anything to her about telling, and she said, 'No. He just walked away like nothing happened.' I asked her how she felt after she told. She said, 'I felt brave and confident and kind of nervous.'

Dr. Silliman-Cohen then read the following portion of Dr. Finkel's medical record as to C.C.'s statement regarding "what happened":

. . . . she said, 'I told my brother first. He said I[ am] safe and wait until mom comes upstairs.' I asked whose fault she thought it was what happened to her, and she said, 'It was his fault.' I confirmed that. I asked if she could say something to [defendant], her stepdad, what she would want to tell him. She said that she would tell him to get off. I asked if there is anything else she might want to tell him, and she said, 'If I was 80 years old I would curse at him.' I asked why would she wait to do that, and she said, 'Because I'm not allowed to curse.' I asked if there[ is] anything she is worried about. She said, 'If he tries to break in and tries to do

something to my mom and me.' I then explained that when she has not felt well and gone to the doctor the doctor asks all kinds of questions, such as does your tummy hurt, your head hurt, or do you have a temperature. The reason the doctor asks those questions is the doctor is trying to understand what is bothering her so the doctor can decide what to take a look at and see if she needs any tests or medicine to get her better. I explained I would be asking her some questions about what had happened, not to make it difficult but just to do the same. I asked if it is important to tell the doctor the truth, and she said, 'Yes.' I asked, 'Why is that?' and she said, 'If you lie they are going to give you the wrong medicine.' I explained it is always important to tell the truth, but particularly important to tell the doctor the truth. I asked if she told me her toe hurt when it was really her thumb that hurt would that make it harder or easier for the doctor to help, and she said, 'Harder.' I explained that one of the things that is special about doctors is you can tell doctors anything, anything that worries you, upsets you, confuses you, or frightens you, and the more you share with the doctor the better the doctor understands because doctors and patients work together to solve problems. I asked what had happened, and she said, 'He was touching my peachy.' I asked where this happened. She said, 'In my bed. I was sleeping and [defendant] woke me up. I could feel his thumb rubbing on my private area.' I asked, 'Which private area?' and she said, 'The one where you go pee.' I asked what she was wearing. She said, 'I wore a blue sweatshirt, a pink belt, and gray pants with white spots on it.' I asked if the touching was on top and she said, 'Yes, on top. My clothes were still on.' Utilizing an anatomic model I showed her the different kinds of touching. She demonstrated the touching was on top between the labia and a sense if it had been underneath the underwear. I asked, 'What did that feel like?' And she said, 'Very

13

uncomfortable. That[ is] all I could think about.' I asked if he touched her in any other way, and she said, 'No.' I asked how often this had happened to her and she said, 'This was the first time.' I asked if it was [un]comfortable just [during] or afterwards. She said, 'After[,] I felt unsafe.' I asked if there is anything else that happened. She said, 'No.' I asked what he was wearing and she said, 'Just the shirt. No pants, no underwear.' I asked if she had to do anything to him and she said, 'No.'

Dr. Silliman-Cohen also recited Dr. Finkel's "[d]iagnostic [a]ssessment" of C.C., which stated:

The historical information that has been provided clearly reflects this young girl experiencing a one-time episode of genital touching over her clothing after her stepdad walked into the room without his pants on. Fortunately, [C.C.] was able to extricate herself from that situation and disclosed immediately to her stepbrother and then to her mother. Her mother has responded in an appropriate and protective manner. Fortunately[,] this appears to have been a one-time incident and [C.C.] not only told right away, but she was believed by her mom, and mom did all the appropriate things that would be expected. Her physical examination does not demonstrate any residual to the contact, nor would we anticipate it to in light of the history that has been provided. The primary impact of her experience is psychological. She would benefit from trauma informed care.

On cross-examination, defense counsel asked Dr. Silliman-Cohen whether the CARES Institute's policy was to assume children are being truthful and she responded, they "assume that children are being truthful."

14

N.A. testified defendant was his father. He was about nine years old at the time of the incident and staying with defendant, A.M., and C.C., his stepsister, for the weekend. He recalled staying awake playing video games in the living room until 5:00 a.m. on September 15, 2019. At about 4:30 a.m., N.A. watched his dad get "a drink." After N.A. went to sleep, C.C. woke him up at about 7:00 a.m. N.A. recalled C.C. was crying and had stated, "Last night I think I saw your dad standing in my doorway naked." N.A. "called [his] mom" because he did not "know what to do." He explained that C.C. had said, "I do [not] know if it was a dream. I do[ not] know if . . . , I was just imagining it. I do[ not] know if it was real." N.A. explained his father came into his room and asked why C.C. was crying and she answered, "I had a dream that my dad has died." N.A. relayed defendant then rubbed C.C.'s back, asked her if she was okay, and kissed her head. After defendant left, N.A. asked C.C. why she mentioned having a bad dream, and C.C. explained "she made it up." After C.C. told her mother, N.A. heard A.M. "yelling" and "throwing stuff" at defendant. N.A. left the house with defendant that morning.

After defense counsel asked N.A. about C.C.'s disclosure, N.A. denied she "mention[ed] anything . . . about touching when she came to [N.A.] that morning." He also did not recall hearing defendant "come upstairs" at any

15

earlier point. After the testimony, the court inquired about giving "the fresh [-]complaint instruction to the jury" and counsel agreed.

N.A.'s mother testified she received a call from her son in the early morning of September 15, 2019. She explained that during the phone call she heard N.A. and C.C. both "sobbing."

A.M. testified that in September 2019, she had been married to defendant for one year and they were together for almost four years. She recalled on the night of September 14, 2019, they had hosted "an end of summer party" and the adults were drinking. She had "four or five drinks," defendant was drinking, and he appeared intoxicated.

She went to sleep after everyone left, but recalled "[defendant] woke [her] up several times throughout the evening" to have sexual relations, but she refused. A.M. stated, "[defendant] kept coming back into my bedroom, into the bed, and touching [her] sexually, rubbing on [her] vagina, and wanting [her] to wake up to have sex. [She] kept denying him" and defendant "would leave the room . . . and then come back down and try again." She maintained this happened "five or six times throughout . . . the night." After she declined defendant's advances, A.M. perceived he was "angry" and "upset" because he "storm[ed]" away and "pouted." She recalled his last attempt was at about 6:00

16

a.m. A.M. woke up at about 8:30 a.m. and observed defendant sleeping "naked" from the waist down next to her wearing "[j]ust a shirt" that was "neon yellow or green."

After she went upstairs, A.M. "met" C.C. and N.A. coming down the stairs. C.C. revealed to A.M. that defendant had "touched her inappropriately and . . . she was scared." A.M. went to her bedroom and confronted defendant. After she again confirmed with C.C. what had happened, she spoke to defendant a second time. A.M. testified that defendant said C.C. "was lying" and "had a dream." A.M. forced defendant to leave the house and called the police.

A.M. testified that after the incident C.C. "developed anxiety," became "timid," and "feels scared or nervous," especially around men she does not know. A.M. explained she divorced defendant. On cross-examination, A.M. admitted calling defendant "foul names." Additionally, she conceded pushing defendant to get him "out of the residence."

During the trial, Worth explained that he was a detective with GTPD and had conducted a recorded forensic interview of C.C. on September 17, 2019. Worth authenticated the video interview of C.C., which was played for the jury. On cross-examination, after Worth was asked if he assumes "children tell the truth about sex abuse," he stated that he keeps an open mind.

17

Defendant testified he had lived with A.M. and C.C. for almost three and a half years. At the time of trial, he was forty-four years old. He recalled that on September 14, 2019, they had a party, and he consumed four or five alcoholic beverages. He recalled being in bed at about 11:30 p.m., A.M. went to bed after him, and he woke up at about 7:30 a.m. He testified to remaining in bed the whole night. After waking up, he went upstairs to see if N.A. and C.C. wanted breakfast and saw "they seemed upset." C.C. indicated "she had a bad dream," so he "patted her on [the] head" and "kissed her cheek." He recalled A.M. accused him of "these bad" acts and "smacked [him] on the head."

Defendant denied ever going into C.C.'s room and touching her. He stated, "[He was] a protector of kids" and "[it is] just preposterous." He explained there had been "problems in the past with [C.C.] with counselors and . . . being untruthful." On cross-examination, he maintained that he went back to bed after offering the children breakfast on September 15, 2019. He denied ever getting a drink during the middle of the night and having any sexual contact with A.M.

The jury convicted defendant of all the charges except lewdness. The State moved for defendant to be sentenced to an extended term as a persistent offender, N.J.S.A. 2C:44-3, because he had three prior criminal convictions.

At defendant's sentencing on February 29, 2024, defense counsel requested the court impose a lesser sentence "in the third-degree range." Defense counsel asked the court to apply mitigating factors: seven (defendant led a law-abiding life for a substantial period of time), N.J.S.A. 2:44-1(b)(7); eight (defendant's conduct was the result of circumstances unlikely to recur), N.J.S.A. 2:44-1(b)(8); nine (the character and attitude of defendant indicate he is unlikely to commit another offense), N.J.S.A. 2:44-1(b)(9); ten (defendant is particularly likely to respond affirmatively to probationary treatment), N.J.S.A. 2:44-1(b)(10); and eleven (imprisonment of defendant would entail excessive hardship to defendant or defendant's dependents), N.J.S.A. 2:44-1(b)(11). In addressing the court, defendant apologized to "all parties involved" and stated that he was sorry "for wasting all their time" and "this whole situation." Defense counsel argued against an extended term because the State had failed under Rule 3:21-4(e) to timely serve the extended term motion within "[fourteen] days of the . . . verdict."

The State requested the court find aggravating factors: two (the gravity and seriousness of harm inflicted on the victim, including whether or not defendant knew . . . the victim of the offense was particularly vulnerable), N.J.S.A. 2:44-1(a)(2); three (risk of reoffending), N.J.S.A. 2:44-1(a)(3); six

19

(defendant's prior criminal record and the seriousness of the offenses), N.J.S.A. 2:44-1(a)(6); and nine (need for deterrence), N.J.S.A. 2:44-1(a)(9). Regarding the extended term, the State requested the court sentence defendant to a term of sixteen years as a persistent offender.

In sentencing defendant, the court noted he was forty-five years old and was "a union electrician" with "a bachelor's degree." Additionally, the court emphasized defendant admitted in the presentence investigation report that at the "time of this incident" he was "under the influence of alcohol and heroin." The court noted defendant had three prior criminal convictions, which included drug offenses and a bad check offense, but declined to impose an extended term because the convictions were older. The court found no mitigating factors but determined aggravating factors two, three, six, and nine applied.

After balancing the factors and assessing "their quality and nature," the court found "the aggravating factors preponderate over the lack of any mitigating factors." The court sentenced defendant on the second-degree sexual assault conviction (count one) to a nine-year term of imprisonment subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court also ordered defendant to comply with all provisions of Megan's Law, N.J.S.A. 2C:7-2, and parole supervision for life,

N.J.S.A. 2C:43-6.4. On the second-degree endangering the welfare of a minor

conviction (count three), N.J.S.A. 2C:24-4(a)(1), the court imposed a concurrent

eight-year term of imprisonment. The court merged counts three and four.

On appeal, defendant raises the following arguments:

POINT I

TESTIMONY REGARDING DEFENDANT'S PURPORTEDLY UNWANTED SEXUAL ADVANCES TOWARD HIS WIFE WAS INADMISSIBLE AND DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE IMPROPER ADMISSION OF THIS EVIDENCE CONTRARY TO N.J.R.E. 403.

POINT II

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO FRESH[-]COMPLAINT TESTIMONY THAT WENT BEYOND WHAT WAS NECESSARY TO DISPEL ANY SUGGESTION OF RECENT FABRICATION AND WAS CUMULATIVE.

POINT III

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE ADMISSION OF IRRELEVANT AND/OR UNDULY PREJUDICIAL EVIDENCE FROM DR. FINKEL'S REPORT WHICH CONTAINED STATEMENTS MADE TO HIM BY THE VICTIM AND DR. FINKEL'S DIAGNOSIS AND OPINIONS REGARDING FUTURE TREATMENT.

POINT IV

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE ADMISSION OF THE VICTIM'S OUT-OF-COURT STATEMENT TO THE DETECTIVE ADMITTED INTO EVIDENCE PURSUANT TO THE TENDER[-]YEARS EXCEPTION TO THE HEARSAY RULE BECAUSE THEY WERE UNTRUSTWORTHY.

POINT V

A SENTENCE OF NINE YEARS IN PRISON FOR THE SECOND-DEGREE SEXUAL ASSAULT CONVICTION WAS EXCESSIVE.

    A) THE COURT ERRONEOUSLY COUNTED AGGRAVATING FACTOR TWO WHICH CONSTITUTED DOUBLE COUNTING.

    B) THE COURT ERRONEOUSLY COUNTED AGGRAVATING FACTOR THREE.

    C) THE COURT FAILED TO STATE THE IMPACT THE PAROLE INELIGIBILITY PERIOD HAD ON THE SENTENCE, AND THEREFORE THE SENTENCE SHOULD BE VACATED AND THE MATTER REMANDED FOR RE-SENTENCING.

II.

Before addressing defendant's evidence contentions, we address the applicable standard of review. Appellate courts "typically review evidentiary rulings under a deferential standard and will 'uphold [the trial court's] determinations absent a showing of an abuse of discretion.'" State v. Trinidad,

22

241 N.J. 425, 448 (2020) (alteration in original) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). We defer to the court's evidentiary rulings unless they were "so wide of the mark that a manifest denial of justice resulted." State v. Gonzalez, 249 N.J. 612, 633 (2022) (quoting State v. Singh, 245 N.J. 1, 13 (2021)). If we determine the court mistakenly exercised its discretion, "we must then determine whether any error found is harmless or requires reversal." Ibid. (quoting State v. Prall, 231 N.J. 567, 581 (2018)). We review a trial court's legal conclusions de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

A.   A.M.'s Testimony Regarding Defendant's Sexual Advances.

We first address defendant's contention that the court erroneously admitted A.M.'s testimony regarding defendant's attempts "to have sex with her . . . several times" during the night, and that he "touched her sexually." Defendant further argues A.M. improperly testified that he became angry, had attempted to have sex at 6:00 a.m. before leaving to go upstairs, and had returned to the bedroom "at some point" before 8:30 a.m. making no further sexual advances. He asserts A.M.'s testimony on these issues was "irrelevant evidence." After our review of the record, we are unpersuaded.

For evidence to be admissible, it must be relevant. Relevant evidence must have a "tendency in reason to prove or disprove any fact of consequence

to the determination of the action." State v. Garcia, 245 N.J. 412, 430 (2021) (quoting N.J.R.E. 401). Evidence is probative under N.J.R.E. 401 "when it has a tendency 'to establish the proposition that it is offered to prove.'" State v. Burr, 195 N.J. 119, 127 (2008) (quoting State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)).

Under N.J.R.E. 403, "relevant evidence may be excluded if its probative value is substantially outweighed by risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." "In determining whether the admission of certain evidence would be unduly prejudicial" the court must consider "whether the evidence's probative value 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence.'" Trinidad, 241 N.J. at 449 (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).

We initially recognize that A.M.'s testimony—regarding defendant's sexual advances, "storming upstairs" and "pouting" after she rebuffed his advances, location during the relevant time period, and state of undress—were firsthand observations made close in time to defendant's assault of C.C.

24

Defendant maintained C.C. fabricated the assault and must have dreamt it occurred. Defendant testified that he slept next to A.M. the entire night after going to sleep at about 11:30 p.m.

After defendant objected to A.M.'s testimony, the court appropriately balanced the relevant factors. It found A.M.'s testimony was relevant and material to the charged events. The court properly limited A.M.'s testimony to what occurred between the late evening of September 14, 2019 and the morning of September 15, 2019.

A review of A.M.'s testimony does not support defendant's argument that the probative value of the testimony was substantially outweighed by its inflammatory potential. Her testimony did not have a probability of diverting the jurors' minds from a fair and reasonable evaluation of the facts. Additionally, his assertion that A.M.'s sexual relations testimony was "[u]ncorroborated" does not negate its admissibility. Defendant had the opportunity to cross-examine A.M. regarding her observations, and we "trust jurors to evaluate a witness's credibility." State v. Cole, 229 N.J. 430, 466 (2017); see State v. Mahoney, 444 N.J. Super. 253, 259 (App. Div. 2016) ("[Jurors] determine the credibility of witnesses[ and] the weight to attach to the[ir] testimony . . . . by weighing the evidence calmly, without passion,

prejudice or sympathy."). We conclude defendant has failed to show "that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." Cole, 229 N.J. at 449 (quoting State v. Carter, 91 N.J. 86, 106 (1982)). We, therefore, discern no error in the admission of A.M.'s firsthand testimony.

## B. Fresh-Complaint Statements.

Defendant next argues that the "fresh[-]complaint testimony of A.M.[,] regarding what C.C. told her . . . occurred that morning," was inadmissible. He contends reversal is warranted because the admitted fresh[-]complaint testimony "went beyond what was necessary [to] prove that C.C. had complained about the touching shortly after it occurred, was cumulative, and . . . unduly prejudicial." After reviewing the testimony and the court's well-stated reasons for admission, we disagree.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Medina, 242 N.J. 397, 421-22 (2020) (emphasis omitted) (quoting N.J.R.E. 801(c)). "Hearsay is generally inadmissible 'except as provided by [the Rules of Evidence] or by other law.'" Prall, 231 N.J. at 585 (alteration in original) (quoting N.J.R.E. 802). "Ordinarily, a third party's

26

testimony about a victim's out-of-court description of an alleged sexual assault is inadmissible hearsay evidence." State v. C.W.H., 465 N.J. Super. 574, 599 (App. Div. 2021). "However, the fresh-complaint doctrine is a common law exception to this rule that 'allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault.'" Ibid. (quoting State v. Hill, 121 N.J. 150, 151 (1990)).

The fresh-complaint doctrine's purpose is to permit "the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." Ibid. (quoting State v. R.K., 220 N.J. 444, 455 (2015)). "[F]resh-complaint evidence serves a narrow purpose" of permitting "the State to negate the inference that the victim was not sexually assaulted because of [his or her] silence." Hill, 121 N.J. at 163. "[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." C.W.H., 465 N.J. Super. at 599 (alteration in original) (quoting R.K., 220 N.J. at 455). "Flexible application of the doctrine to children's complaints is recognized as a necessity since children are especially vulnerable to being cajoled or coerced by their abusers into

27

remaining silent; they may be too frightened or embarrassed to reveal the abuse." State v. Pillar, 359 N.J. Super. 249, 282 (App. Div. 2003); see also State v. L.P., 352 N.J. Super. 369, 384 (App. Div. 2002) (relying on the "continuing aura of intimidation" in determining statements were made within a reasonable time).

Defendant does not contest that C.C. made her disclosure to A.M. "spontaneously and voluntarily" about an hour after the sexual assault occurred and that C.C. would ordinarily turn to her mother for support. C.C. was eight years old and defendant was about forty years old. It is also undisputed that on the morning of September 15, 2019 everyone in the home observed that C.C. was crying and upset. Further, defendant argued in defense that C.C. fabricated the assault.

Defendant's assertion that A.M.'s fresh-complaint testimony "went beyond what was necessary" regarding C.C.'s disclosed touching is unsupported. The court correctly limited A.M.'s testimony to the first disclosure C.C. made on the morning of the incident. We are unpersuaded by defendant's argument that the fresh-complaint testimony should have been precluded and "the jury [permitted to] decide the case on the facts . . . of he-said/she-said." Here, the court admitted the fresh-complaint evidence after conducting a fact-sensitive analysis, noting it was admitted to negate an inference of delay and fabrication.

Further, the court charged the jury on the limited use of the fresh-complaint testimony.[2] While fresh-complaint evidence may not be offered to bolster the victim's credibility and courts may "exclude cumulative fresh-complaint testimony that is prejudicial," Hill, 121 N.J. at 170, after our review of the record, we discern no error in the court's exercise of its discretion. Thus, we conclude the court did not abuse its discretion in admitting the limited fresh-complaint evidence.

### C. Statement for Medical Diagnosis or Treatment.

Defendant next contends the court erred in admitting C.C.'s statements to Dr. Finkel. He contends the entire statement should have been barred because it was irrelevant, unduly prejudicial, and cumulative. He also asserts the court committed plain error by permitting Dr. Silliman-Cohen to testify to Dr. Finkel's medical record in violation of the Confrontation Clause. Lastly, he argues Dr. Finkel's report was a net opinion and improperly admitted because the "diagnosis and treatment [evaluation] of C.C." was unsupported by any medically accepted foundation, demonstrating its reliability.

---

[2] We note defendant does not appeal from N.A.'s fresh-complaint testimony that was arguably favorable to defendant.

N.J.R.E. 803(c)(4) permits the admission of hearsay statements made for the purpose of medical diagnosis or treatment. The Rule requires the statements be "made in good faith for purposes of . . . medical diagnosis or treatment" and describe "past or present symptoms or sensations," "or their general cause." N.J.R.E. 803(c)(4)(A) to (B). It has long been recognized that a patient's statements given "for the purpose of diagnosis" are admissible based on the premise of reliability. Palmisano v. Pear, 306 N.J. Super. 395, 400 (App. Div. 1997). "The hearsay exception for statements made for purposes of medical diagnosis or treatment, N.J.R.E. 803(c)(4), is directed at statements made by the patient not the doctor or therapist." In re Commitment of G.G.N., 372 N.J. Super. 42, 56-57 (App. Div. 2004).

The Rule generally precludes "statements as to the cause of the symptoms or conditions" because they are not relevant to the patient's treatment. Cestero v. Ferrara, 57 N.J. 497, 501 (1971) (emphasis in original). Similarly, our "courts have held that statements naming alleged perpetrators are inadmissible because that information is irrelevant to a medical diagnosis and treatment." State v. E.R., 457 N.J. Super. 377, 383-84 (App. Div. 2016). However, hearsay statements "made for the purposes of determining the possible cause of" a

patient's diagnosis are admissible.  See Marino v. Abex Corp., 471 N.J. Super. 263, 295-96 (App. Div. 2022).

As we have already explained, evidence should be excluded "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."  Cole, 229 N.J. at 448 (quoting N.J.R.E. 403).  In addressing the probative value of evidence against undue prejudice, the court is also charged to serve a "gatekeeping function and assess[es] whether the evidence was cumulative and should have been limited." State v. Santamaria, 236 N.J. 390, 409 (2019).

The court permitted the admission of redacted portions of C.C.'s statement to Dr. Finkel and his opinion related to his diagnosis and treatment evaluation. In considering N.J.R.E. 803(c)(4), the court noted Dr. Finkel's evaluation was conducted to diagnose and treat C.C. for any residual psychological effects related to the sexual assault.  To reach a medical diagnosis, Dr. Finkel had to be informed as to C.C.'s account of what occurred.  Dr. Finkel ultimately opined the physical exam revealed no evidence but that there was a residual psychological effect from the incident.  He recommended trauma informed care.

31

Defense counsel did not refute that C.C.'s statements to Dr. Finkel were for diagnosis and treatment.

While defendant argues C.C.'s entire statement should have been precluded, he specifically argues the following statements were highly prejudicial and cumulative: she "was scared if [she] told [her] mom right away[,] he was just standing right there"; she "waited until [her] mom went upstairs to tell"; and she "thought [defendant] would start yelling and make up lies." He further argues that the court improperly admitted C.C.'s double hearsay statement that "[N.A.] said [she was] safe," her identification of defendant as the perpetrator, comment she "would tell [defendant] to get off. . . . [and] would curse at him," and fear defendant might "tr[y] to break in and . . . do something to . . . [A.M.] and [her]."

While we disagree with defendant's contention that all of C.C.'s good faith statements to Dr. Finkel were inadmissible, we do agree that the court erroneously admitted irrelevant and cumulative portions of the medical record. The context and purpose of the medical evaluation record is important. It is undisputed that Dr. Finkel's examination was for C.C.'s medical diagnosis and treatment. While our review of the court's evidence rulings is deferential, we conclude the court should have precluded the imbedded double-hearsay

statements regarding N.A.'s statements after C.C. reported the incident. Additionally, it should have ordered the redaction of C.C.'s statements regarding how and when she reported the incident to her mother, C.C.'s recitation of what she would tell defendant in the future, and her fear of defendant committing future acts. The State failed to establish the relevance of these statements and portions of the statements were cumulative. Further, C.C.'s statements identifying defendant and portions of Dr. Finkel's statements not related to diagnoses, were admitted in error.

Nevertheless, in viewing the inadmissible statements of Dr. Finkel's medical record in the context of the trial evidence and against C.C.'s good faith statements provided for the purposes of medical diagnosis or treatment, we conclude the "error 'is [not] of such a nature as to have been clearly capable of producing an unjust result.'" State v. Hedgespeth, 249 N.J. 234, 252 (2021) (quoting State v. Kuchera, 198 N.J. 482, 501 (2009)). Defendant conceded to the admissibility under the exception but had objected based on prejudice. In reviewing the totality of the evidence presented at trial, we do not discern that the error was clearly capable of producing an unjust result. R. 2:10-2.

Defendant next argues he was "denied the right to confront" Dr. Finkel because he "did not testify at trial." "The Sixth Amendment to the United States

33

Constitution and Article 1, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront 'the witnesses against him.'" State v. Branch, 182 N.J. 338, 348 (2005) (first quoting U.S. Const. amend. VI; and then citing N.J. Const. art. I, ¶ 10). The Confrontation Clause provides a defendant with "the opportunity to cross-examine and impeach the State's witnesses." State v. Williams, 184 N.J. 432, 443 (2005); see also State v. Budis, 125 N.J. 519, 530-31 (1991) ("Among the primary interests protected by the right of confrontation are the opportunity for defendants to face their accusers and to cross-examine the [S]tate's witnesses."). "The right to confront and cross-examine accusing witnesses is 'among the minimum essentials of a fair trial.'" Budis, 125 N.J. at 531 (quoting Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973)).

The Confrontation Clause prohibits a party from introducing testimonial hearsay "as a substitute for in-court testimony when a defendant has never been given the opportunity to cross-examine the witness." State v. Cabbell, 207 N.J. 311, 329 (2011); Crawford v. Washington, 541 U.S. 36, 51 (2004). The Supreme Court, in State v. Michaels, explained that Confrontation Clause issues arise when a court admits a non-testifying expert's forensic report through a testifying expert witness who did not independently review the underlying data

before offering an opinion. 219 N.J. 1, 42-45 (2014) (permitting the State to present a substitute expert's "signed and certified report, based on [their] independent review of machine-generated data, through [their] live testimony, did not violate defendant's confrontation rights").

In the present case, the record demonstrates the court addressed with counsel multiple times throughout the trial whether Dr. Finkel would testify from Scotland. The court was prepared to accommodate and arrange for "FaceTime or [an] equivalent" "platform" for the "doctor . . . in Scotland." Defense counsel consented to Dr. Silliman-Cohen testifying in lieu of Dr. Finkel, stating to the court "that [it was] fine" for the court to "call off Scotland." See State v. Williams, 219 N.J. 89, 93 (2014) (noting a defendant "may waive his right of confrontation and choose not to object to testimony"). The trial court provided defendant the opportunity to object "and then properly deferred to each party's strategic and tactical decisions in allowing each party to try the case as it saw fit." Santamaria, 236 N.J. at 408. "[G]enerally, a defendant must attempt to exercise his confrontation right and object when necessary, if he wishes later to claim that he was denied that right." Williams, 219 N.J. at 93. We may infer from defense counsel's failure to object, and evident consent, to Dr. Silliman-

Cohen's testimony in lieu of Dr. Finkel, that she did not perceive the substitution was prejudicial. State v. Irving, 114 N.J. 427, 444 (1989).

Again, defense counsel acknowledged that C.C.'s statements fell within N.J.R.E. 803(c)(4)'s hearsay exception. However, defense counsel specifically argued in opposition that the statements were inadmissible, cumulative, and overly prejudicial evidence, which demonstrated that the consent to Dr. Silliman-Cohen's testimony was an informed decision. Defendant's failure to object deprived the court of an opportunity to take curative action. State v. Timmendequas, 161 N.J. 515, 576 (1999) (stating that "[g]enerally, if no objection was made to . . . improper remarks, the remarks will not be deemed prejudicial" because the "failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial" and the court was "deprived of the opportunity to take curative action").

A party's "failure to 'object or otherwise preserve an issue for appeal at the trial court level' limits appellate review to a plain error inquiry." State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting Santamaria, 236 N.J. at 404). Our Supreme Court has stated that "[p]lain error has intentionally been created as a high bar for parties to meet in order to encourage litigants to raise any objections to evidence at the trial level where the court can best 'forestall or correct a

potential error,' in a timely manner." Santamaria, 236 N.J. at 409 (quoting State v. Bueso, 225 N.J. 193, 203 (2016)). "The mere possibility of an unjust result is not enough." State v. Canfield, 470 N.J. Super. 234, 273 (App. Div. 2022). In addition to defendant affirmatively waiving his right of confrontation by agreeing to Dr. Silliman-Cohen's testimony, we conclude the admission of her testimony does not constitute plain error, resulting in an unjust result.

Regarding defendant's net opinion argument, he also never objected to Dr. Finkel's medical evaluation and treatment recommendation based on a lack of foundation. Defendant now posits "Dr. Finkel's diagnosis and treatment of C.C. provided no principles and methods, nor any research, analysis, or industry standard, against which the reliability of his opinions regarding the diagnosis and treatment of C.C." may be reviewed.

The Supreme court has explained that "the net opinion rule 'requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.'" State v. Townsend, 186 N.J. 473, 494 (2006); Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002). It is recognized that "[t]he net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015)

37

(alteration in original) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)).

Defendant's failure to assert a net opinion objection deprived the court of the opportunity to address the underlying medical foundation for Dr. Finkel's treatment and diagnosis opinions.[3] It is again important to note that defendant consented to Dr. Silliman-Cohen's testimony in lieu of Dr. Finkel's and had ample opportunity to raise an objection under N.J.R.E. 703.

Further, Dr. Silliman-Cohen testified that, as a pediatrician and the director of the CARES Institute, she was familiar with the protocols regarding the medical examinations and diagnoses of children that have suffered abuse or neglect. The record demonstrates defendant did not cross-examine her regarding the accepted medical evaluation standards. We, therefore, are convinced defendant waived his net opinion objection and has failed to demonstrate that the admission of the testimony rises to the level of plain error. R. 2:10-2 (stating

_____

[3] We note defendant failed to submit Dr. Finkel's medical records, depriving us of a meaningful review of the net opinion argument. R. 2:6-1(a)(1)(I). "We are not 'obliged to attempt review of an issue when the relevant portions of the record are not included.'" State v. D.F.W., 468 N.J. Super. 422, 447 (App. Div. 2021) (quoting Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C., 381 N.J. Super. 119, 127 (App. Div. 2005)).

plain error "is of such a nature as to have been clearly capable of producing an unjust result").

### D.  C.C.'s Video-Recorded Hearsay Statement.

Defendant next asserts the court erred in admitting C.C.'s video-recorded hearsay statement under the tender-years exception, N.J.R.E. 803(c)(27).  He contends C.C.'s statement that "thousands of people . . . [told] me what happened" demonstrates the statement is untrustworthy.  Defendant argues reversal is warranted because C.C.'s statement was not "her own recollection" but rather it was based on facts others "told to her about . . . what happened."

N.J.R.E. 803(c)(27) provides:

> A statement made by a child under the age of [twelve] relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil case if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

39

The State bears the burden of proving the probability that the statement is trustworthy by a preponderance of the evidence. State v. James, 346 N.J. Super. 441, 457 (App. Div. 2002).

In determining whether a statement is sufficiently trustworthy to warrant its admission under the tender-years exception, a court must consider "the totality of the circumstances." State v. P.S., 202 N.J. 232, 249 (2010). The Supreme Court has identified the following "non-exclusive list of factors relevant to evaluating the reliability of out-of-court statements made by child victims of sexual abuse": (1) the spontaneity of the statement, whether it was made without prompting or suggestive questioning; (2) whether the account provided by the declarant is consistently repeated; (3) the "mental state of the declarant"; (4) the "use of terminology unexpected of a child of similar age"; and (5) the declarant's "lack of motive to fabricate." Ibid. (citing Idaho v. Wright, 497 U.S. 805, 821-22 (1990)); see also State in the Int. of A.R., 234 N.J. 82, 103-04 (2018).

Our Supreme Court has recognized that the spontaneity of a child's statement can be undermined by "prior interrogation, prompting, or manipulation by adults." State v. D.G., 157 N.J. 112, 133 (1999) (quoting Wright, 497 U.S. at 826-27) (concerning the involvement of actors outside law

enforcement, such as family members). Other factors to consider include the partisanship of the questioner and the questioner's ability to observe and recall the statement. State v. R.M., 245 N.J. Super. 504, 516-17 (App. Div. 1991).

A court's determination on whether to admit a child's statement under the tender-years exception may also be guided by the relevant factors identified by our Supreme Court in State v. Michaels: (1) "a lack of investigatory independence"; (2) "the pursuit by the interviewer of a preconceived notion of what has happened to the child"; (3) "the use of leading questions"; (4) "a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers"; (5) "[t]he use of incessantly repeated questions"; (6) "[t]he explicit vilification or criticism of the person charged with wrongdoing"; and (7) "the interviewer's tone of voice, mild threats, praise, cajoling, bribes and rewards, as well as resort to peer pressure." 136 N.J. 299, 309-10 (1994).

"[C]ourts have considerable leeway in their consideration of appropriate factors" so long as the factors relate to "whether the child declarant was particularly likely to be telling the truth when the statement was made." D.G., 157 N.J. at 125 (quoting Wright, 497 U.S. at 822). Further, our Supreme Court has emphasized "the importance of videotaping child interviews and [has] held

41

that such videotapes should be considered in any trustworthiness analysis." P.S., 202 N.J. at 250.

In admitting C.C.'s statement to Worth, the court considered the relevant factors under the tender-years exception and found the statement was trustworthy. C.C. was eight years old when she gave Worth the statement about defendant's sexual assault. Worth testified to his substantial training and experience, having conducted over eighty interviews. After the court had the opportunity to assess Worth's testimony and watch the video-recorded statement, it found C.C. was "calm" during the interview and materially responded to Worth's questions, which were not "suggestive or misleading."

Further, after considering C.C.'s interview comment about talking to "thousands of people," the court noted the interview was only two days after the incident. In reviewing the context of the comment relative to the entire recorded statement, the court properly found her comment was an age-commensurate response. We reject defendant's argument that the statement was inadmissible because it was inherently untrustworthy "due to the taint of what numerous people told" C.C. Defendant's bare assertion is unsupported by the facts in the record. He has failed to assert any genuine issue undermining the neutrality of Worth's interview of C.C. and to demonstrate there was any undue

suggestiveness. The court's admission of C.C.'s statement is "supported by sufficient credible evidence in the record." A.R., 234 N.J. at 104 (quoting P.S., 202 N.J. at 249). Thus, we are convinced the court committed no error in admitting C.C.'s tender-years statement.

III.

Finally, defendant contends resentencing is required because the court committed three sentencing errors. After recognizing our standard of review, we address each argument in turn.

"We use a limited scope of review when considering a court's sentencing determinations on appeal and apply an abuse of discretion standard." State v. R.A.M., 482 N.J. Super. 439 (App. Div. 2025). Generally, appellate courts defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014).

Our Supreme Court has stated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

43

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"At sentencing, the 'court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence.'" R.A.M., 482 N.J. Super. at 460 (quoting State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008)). Once a sentencing court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Morente-Dubon, 474 N.J. Super. 197, 208 (App. Div. 2022) (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)); see also Case, 220 N.J. at 65 (instructing that appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record").

## A.  Aggravating Factor Two.

Defendant first contends "the court engaged in improper double-counting of aggravating . . . factor two and misapplied the facts of the case in finding the victim particularly vulnerable due to [her] relationship [with] defendant." Specifically, he argues the court erroneously double-counted C.C.'s "age" under

44

aggravating factor two because he was convicted of N.J.S.A. 2C:14-2(b), which includes as an element that "the age of the victim . . . is less than [thirteen] years old and the actor is at least four years older than the victim."

In finding aggravating factor two, the court described the family dynamic and noted C.C. was an "eight-year-old," was defendant's "stepdaughter," and "was particularly vulnerable by his empowered position in the family as her stepfather." The State had argued under factor two that after the incident C.C. required counseling, the "event . . . changed her entire life," and defendant's sexual assault caused her to "suffer[] every day with interacting with individuals and trusting adults." While the court mentioned C.C.'s age in the context of the family dynamic, it did so highlighting that she was defendant's "stepdaughter" and "particularly vulnerable." We note the court mentioned earlier in its sentencing findings the incident occurred after "a family party." Specifically, the court stated, "[T]he specific facts attendant to these crimes" and defendant's "position" directly caused "the harm to this child." We conclude, the court did not commit impermissible double counting and sufficiently "state[d] [its] reasons" and "the factual basis supporting [its] finding of [the] particular aggravating . . . factor[]." R. 3:21-4(h).

## B. Aggravating Factor Three.

Defendant next argues the court erred in finding a risk of re-offense under aggravating factor three. In finding the aggravating factor, the court considered the presentence report, noted defendant's use of alcohol and heroin at the time of the incident, and acknowledged his "long history of substance abuse challenges." The record demonstrates the court focused on defendant's criminal convictions in reciting his complete history. Therefore, his contention that the court based its findings on the "prior arrest history" is without merit.

Defendant's additional argument that the court failed to consider relevant facts under factor three, including his steps toward "rehabilitation" and "whether he [was] . . . gainfully employed," is also misplaced. The record shows the court considered that defendant was an "employed . . . electrician." The court also recognized his two prior convictions for drug related offenses were "older than ten years." It weighed the relevant facts in finding his risk of re-offense. We, therefore, reject his assertion that the court's "only explanation for . . . finding . . . aggravating factor three was based on . . . impermissible considerations."

## C. Parole Ineligibility.

Defendant's third sentencing contention is that the court "failed [to] set forth the impact of the [eighty-five percent period of] parole ineligibility." The court found the imposed parole ineligibility period was "sufficient to satisfy the interest of justice and deter this type of conduct." Defendant's argument ignores that the court considered the totality of facts, including his health status and substance abuse, and the need to protect "this victim and the public from this recidivist." It also addressed the full impact of defendant's sentence in denying the State's persistent offender extended term request. We conclude the court weighed the relevant facts in finding defendant's sentence above the mid-range was supported and warranted.

Finally, we observe the court found no mitigating factors and gave substantial weight to the aggravating factors. The Supreme Court has noted "'reason suggests that . . . when the aggravating factors preponderate, sentences will tend toward the higher end of the range.'" State v. Kiriakakis, 235 N.J. 420, 436 (2018) (quoting State v. Natale, 184 N.J. 458, 488 (2005)). While the court ordered "a nine-year . . . state prison term subject to NERA" on count one, the court stated it had given "due consideration [to] the real-time consequences of

47

the sentence to be imposed under [NERA]."  We, therefore, discern no reason to disturb the court's sentence of defendant.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2746-23